1998 OK 105

**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**John Ray STOW, Jr., Respondent.**

**No. 4291.**

Supreme Court of Oklahoma.

Oct. 21, 1998.

Rehearing Denied Dec. 15, 1999.

Allen J. Welch, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, Oklahoma, For Complainant,

John Ray Stow, Jr., Norman, Oklahoma, Pro Se.

ALMA WILSON, Justice.

¶1 The complainant, Oklahoma Bar Association (Bar Association), charged the respondent, John Ray Stow, Jr., with three counts of misconduct. In Count I, the Bar Association alleges that the respondent accepted an advance on attorney fees and refused to return or account for an unearned balance to his client, all in violation of Rule 1.4(b)[1] of the Rules Governing Disciplinary Proceedings (RGDP), 5 O.S.Supp.1997, ch. 1, app. 1–A, and Rule 1.15(b)[2] of the Oklahoma Rules of Professional Conduct (ORPC), 5 O.S.1991, ch. 1, app. 3–A. In Count II, the Bar Association alleges that the respondent failed to comply with several requests from the Office of General Counsel of the Bar Association for an accounting of the client's funds until nearly one year had passed, all in violation of Rule 8.1(b),[3] ORPC. In Count III, the Bar Association alleges that the respondent failed to respond to the request of the Office of General Counsel of the Bar Association to answer the grievance filed against him by his client. The Bar Association asserts that the respondent's failure to answer the grievance is a violation of Rule 5.2,[4] RGDP.

## I. FACTS

¶2 The trial panel heard the evidence over a two day period, January 12, 1998, and

---

1. Rule 1.4(b), RGDP, provides: "Where money or other property has been entrusted to any attorney for a specific purpose, he must apply it to that purpose. He may not avail himself of a counterclaim or set-off for fees against any money or other property of his client coming into his hands for such specific purpose, and a refusal to account for and deliver over such money or property upon demand shall be deemed a conversion. This does not apply to the retention of money or other property otherwise coming into the hands of a lawyer and upon which the lawyer has a valid lien for his services."

2. Rule 1.15(b), ORPC, provides: "(b) Upon receiving funds or other property in which a client or third person has an interest a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and upon request by the client or third person shall promptly render a full accounting regarding such property."

3. Rule 8.1, ORPC, provides: "An applicant for admission to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:
    "(a) knowingly make a false statement of material fact, or

    "(b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this rule does not require disclosure of information otherwise protected by Rule 1.6."

4. Rule 5.2, RGDP, provides: "After making such preliminary investigation as the General Counsel may deem appropriate, the General Counsel shall either (1) notify the person filing the grievance and the lawyer that the allegations of the grievance are inadequate, incomplete, or insufficient to warrant the further attention of the Commission, provided that such action shall be reported to the Commission at its next meeting, or (2) file and serve a copy of the grievance (or, in the case of an investigation instituted on the part of the General Counsel or the Commission without the filing of a signed grievance, a recital of the relevant facts or allegations) upon the lawyer, who shall thereafter make a written response which contains a full and fair disclosure of all the facts and circumstances pertaining to the respondent lawyer's alleged misconduct unless the respondent's refusal to do so is predicated upon expressed constitutional grounds. Deliberate misrepresentation in such response shall itself be grounds for discipline. The failure of a lawyer to answer within twenty (20) days after service of the grievance (or recital of facts or allegations), or such further time as may be

February 10, 1998, and found that the allegations of the Bar Association were proven by clear and convincing evidence. The panel concluded that the respondent had purposely deprived his client of money by way of fraud and deceit, and that his conduct called for disbarment. Accordingly, the panel recommended that the respondent be disbarred, but in addition, suggested an alternative as a minimum discipline, that the respondent be suspended from the practice of law for two years and one day for professional misconduct, and that he be further ordered to pay the costs of this action.

¶ 3 The Bar Association presented evidence to support the following set of facts. On November 12, 1991, Anita Booth and her husband Mike Booth, retained the respondent to file a bankruptcy for them. The Booths never executed a contract with the respondent for this representation, but Mrs. Booth testified that the respondent agreed to represent the Booths for a flat fee of $3,000.00 to $4,000.00. During the course of the respondent's representation of the Booths, they also asked him to file a lawsuit against Fajita Junction, and to represent them in other matters resulting from their failed business as well. Mrs. Booth testified that the attorney fee arrangement was always very vague, but the respondent continued to take money from the Booths on the representation that he would bill against the amount received from the Booths.

¶ 4 From November 14, 1991, through September 10, 1993, the Booths paid the respondent $30,141.00, and the respondent testified that all that money was deposited into his "escrow" account at Will Rogers Bank. He further testified that there was no distinction between his escrow account and a trust account. On September 22, 1993, Mike Booth died unexpectedly.

¶ 5 The first accounting received by either Mr. or Mrs. Booth occurred subsequent to Mr. Booth's death. That statement, dated February 11, 1994, consisted of eight pages listing dates from November 12, 1991, to December 29, 1993, and professional services

rendered, but did not reveal the time spent in rendering the services. The attorney fees charged were $12,466.75, and the costs were listed at $574.83, for a total of $13,041.58. The respondent listed the payments made into the "Retainer Account" as $19,740.00, for a balance of $6,698.42 retained by the respondent for future fees and costs. During his testimony, the respondent agreed that he had failed to include payments made to the retainer account by Mrs. Booth in September 1993, of $10,401.00, which he included in his Transaction Listing dated July 10, 1997. So instead of a balance of $6,698.42, the actual balance on February 11, 1994, would have been $17,099.42. Mrs. Booth testified that she asked several times for an accounting, and that the respondent separate the bills for the Fajita Junction lawsuit from the bankruptcy. She testified that she made many appointments with him to ask what was taking so long, and to account for the money paid into the retainer account. She received no satisfactory answers, and each appointment resulted in another charge to her.

¶ 6 An attorney friend of Mrs. Booth, Mike Moore, assisted her in preparing a letter to the respondent, dated March 16, 1996, in which she demanded a full accounting, the balance of the retained funds, and location of those funds. The respondent on April 6, 1996, mailed Mrs. Booth what the respondent described as a work sheet, itemizing payments to and withdrawals from the Retainer Account. It showed the total payments to the account to be $30,141.00, and the total withdrawals to be $5,949.00, but no information concerning fees, costs, or location of the funds.

¶ 7 Both Mr. Moore and Mrs. Booth met with the respondent about April 8, 1996. The following month, Moore visited alone with the respondent regarding the accounting. The respondent had previously refunded $5,000.00 to Mrs. Booth. Moore testified that he had determined the respondent still retained unearned funds of $8,000.00. When Moore related this to the respondent, he replied that he did owe Mrs. Booth some

granted by the General Counsel, shall be grounds for discipline. The General Counsel shall make such further investigation of the grievance and

response as the General Counsel may deem appropriate before taking any action."

money, but if she decided to fire the respondent and asked for her money back, he did not have it available and would have to find a way to make it up to her. Moore testified that the respondent had acknowledged he had received funds from Mrs. Booth, had expended all of the funds, and had retained none in any of his accounts. The respondent had not represented to Moore that he had earned all of the funds. Although the respondent promised a more complete accounting, he did not provide one, and so Moore sent a grievance to the Bar Association, dated June 24, 1996. Mrs. Booth also sent a letter to the Bar Association, dated June 21, 1996.

¶ 8 Three different accountings, dated October 14, 1996, June 26, 1997, and July 10, 1997, provided by the respondent to Mrs. Booth were entered as exhibits by the Bar Association. The documents are lengthy. The respondent testified that the first two were drafts. He testified that because of a computer crash he had to reconstruct the statements from his files, which is why he had taken so long to provide a final accounting. The total billable on the three statements was $18,983.90, $18,631.21, and $21,165.71, respectively. From the $30,141.00 paid to the respondent by the Booths, $949.00 was paid to a creditor of the Booths, and $5,000.00 was returned to Mrs. Booth on September 15, 1994. Without any documentation to prove it, the respondent claimed that he had also returned $2,800.00 to either Mr. or Mrs. Booth about May of 1993. This still left a balance of $226.29, which the respondent sent to Mrs. Booth after he had completed the July 10, 1997, statement of account.

¶ 9 Concerning time records, the respondent testified that he had lost Mrs. Booth's records when his computer crashed, and he revealed that he did not keep a contemporaneous hard copy of time records. He testified that he reconstructed some of Mrs. Booth's time records four years after the service was performed. When determining how much to withdraw from his trust account for services, the respondent testified that he

transferred money out of the trust account as he needed funds. When he withdrew the money, he did not know specifically which client funds were being withdrawn, and he did not send any notice to his clients. He testified that he "just knew roughly" and "had a feel for work being done" and that he was "probably about even with her" in the services he provided Mrs. Booth and the amount he withdrew for those services. He admitted that he was embarrassed and ashamed with regards to his accounting to Mrs. Booth.

## II.   MISHANDLING FUNDS

¶ 10   The Bar Association alleges in Count I of the Complaint that the respondent violated Rule 1.15(b), ORPC, and Rule 1.4(b), RGDP. The violation is that the respondent failed to promptly render a full accounting to Mrs. Booth, and to promptly deliver the remaining unearned funds upon her demand. Rule 1.4, RGDP, provides that a refusal to account for and deliver over client's funds shall be deemed a conversion.

¶ 11   One exhibit, marked PRT Panel Ex # 2, consists of copies of bank statements, checks and deposit slips from the respondent's bank account, which he testified is his trust account, denominated an escrow account. The bank statements are dated from January 29, 1993, through December 30, 1994. One deposit slip, dated "9/24/3" [sic] records the deposit of three checks written by Mrs. Booth in the total amount of $10,401.00, which were to go into the respondent's retainer account. From that September 30, 1993, bank statement to September 30, 1994, the statements reveal that with the exception of two months, the balance at the end of the month in the trust account fell below $5,000.00. Seven times during that period, the respondent was charged for writing checks when there were insufficient funds to cover the checks. During three months, the statements show negative balances.[5] On September 15, 1994, the respondent refunded $5,000.00 to Mrs. Booth. Since the respondent never claims that he earned that $5,000.00, that amount should

---

5.   For example, on February 14, 1994, the balance showed as negative $907.47. On April 15, 1994, the balance is negative $1,221.84, and on April 4, 1994, the balance is negative $711.84.

have remained in his trust account during the entire year. Yet there is not a single month where the balance in the trust account did not fall below $5,000.00 at some point.

¶ 12 A review of the transcript and exhibits reveals that the respondent did not even attempt to keep an account of the funds that remained in his trust account. By his own admission, he withdrew funds whenever he needed them. Even though his undergraduate education included accounting, and he became comptroller of a company, the respondent's testimony implies that he has no understanding of the necessity of maintaining separate records of funds deposited into his trust account for the benefit of his clients. The checks he wrote to himself out of the trust account do not identify whose funds he was withdrawing. The evidence is clear and convincing that the respondent withdrew funds for his own benefit that Mrs. Booth had advanced toward attorney fees, but which the respondent had not earned.

¶ 13 When evaluating the mishandling of funds, this Court has employed three levels of culpability: (1) commingling; (2) simple conversion; and (3) misappropriation. *State ex rel. Oklahoma Bar Association v. Meek,* 1994 OK 118, ¶ 9, 895 P.2d 692, 698. Discipline has extended from censure to disbarment, depending in large part on the degree of harm to the client.[6]

¶ 14 A lawyer has commingled funds when he combines client funds with his personal funds. *State ex rel. Oklahoma Bar Association v. Johnston,* 1993 OK 91, ¶ 22, 863 P.2d 1136, 1144. In *Johnston,* we found an attorney had committed commingling when he withdrew trust account funds intended for his client's medical bills and placed them in his personal account. For this and other acts of misconduct, Johnston was suspended for four months.

¶ 15 Simple conversion occurs when the attorney uses a client's money for some purpose other than that for which it was intended. Rule 1.4(b), RGDP. *In State ex rel. Okla. Bar Association v. Farrant,* 1994 OK 13, 867 P.2d 1279, the respondent committed simple conversion when he applied a payment from a client, intended for a private investigator's services, to his own fees. That private investigator eventually instituted a collection action against the client. For this and other infractions, the attorney was suspended from the practice of law for one year.

¶ 16 Misappropriation occurs when an attorney purposely deprives a client of money by way of deceit and fraud. A lawyer who intentionally inflicts grave economic harm through mishandling clients' funds has committed the most grievous degree of offense, which mandates disbarment. *Johnston,* 1993 OK 91, ¶ 25, 863 P.2d at 1145. In *State ex rel. Okla. Bar Association v. Raskin,* 1982 OK 39, 642 P.2d 262, the respondent was disbarred after he used client funds to pay his own mortgage and car payments. That respondent's misconduct caused the IRS to place a lien on the client's home and property. That same attorney exposed a client in a criminal case to contempt charges when the attorney misappropriated funds intended as restitution to the victim for the client's conversion of property. *Raskin,* 1982 OK 39, ¶ 4, 642 P.2d at 264.

¶ 17 The respondent, in the case now before us, improperly allowed the balance of his trust account to fall to a level below the amount he should have retained as unearned attorney's fees. He made no attempt to keep accurate records of client funds. He used at least $5,000.00 of his client's money for his benefit for a period of almost a year before refunding it. But the evidence is not clear and convincing that he used fraud and deceit

---

**6.** *State ex rel. Okla. Bar Ass'n v. McManus,* 1993 OK 66, 852 P.2d 727 (public censure for attorney who commingled personal funds in his client trust account, neglected client concerns and failed to respond to Bar grievance); *State ex rel. Okla. Bar Ass'n v. Geb,* 1972 OK 17, 494 P.2d 299 (twelve month suspension for attorney with previous discipline who commingled and failed to promptly remit client funds); *State ex rel. Okla. Bar Ass'n v. Kessler,* 1991 OK 81, 818 P.2d 463

(two years and one day suspension for commingling client funds, use of funds for unauthorized purposes and misrepresentation to court that funds had been used for designated purpose); *State ex rel. Okla. Bar Ass'n v. Gasaway,* 1993 OK 133, 863 P.2d 1189 (disbarment for repeatedly commingling clients' funds, converting property of clients, and other improprieties with client funds).

to deprive Mrs. Booth of her funds, only that he was careless with accounting for earned fees. The evidence is clear and convincing that the respondent converted his client's funds to his own benefit.

¶ 18 To reveal the damages suffered by Mrs. Booth, the Bar Association presented evidence that the respondent had settled a civil lawsuit with Mrs. Booth, who had alleged that the respondent had failed to account for unearned funds, and failed to turn over her files upon request. The parties settled for $15,000.00, which was to be paid in three installments. At the time of the hearing before the trial panel, two of the three payments were due, and none were paid. Respondent testified that he had not received the funds he had anticipated to pay the settlement agreement, but that he still intended to pay.[7] The respondent claims that this settlement is not an admission of guilt. Nevertheless, this Court may consider that the respondent has agreed to pay the settlement, and has not yet honored his agreement.

### III. DUE PROCESS

¶ 19 The respondent complains in his brief that the Bar Association's Complaint only alleged a refusal or failure to provide an accounting, failure to communicate with the bar, and failure to file a response to the complaint. The respondent alleges that his due process rights were violated because conversion and misappropriation were not specifically alleged in the complaint. This Court has held that a lawyer is entitled to due process during the course of disciplinary proceedings. *State ex rel. Okla. Bar Association v. Lobaugh*, 1988 OK 144, ¶ 16, 781 P.2d 806, 811.

¶ 20 Count I of the Complaint alleges that between November 14, 1991, and September 10, 1993, Mr. and Mrs. Booth paid the respondent $30,141.00 towards attorney fees. The Complaint continues that the respondent refunded $5,000.00 to Mrs. Booth on September 16, 1994, and that he subsequently represented to her that she had incurred $17,026.44 in attorney fees. The Complaint alleges that the respondent had refused to return or account for the unearned balance of $8,114.56 to Mrs. Booth, and that his conduct had violated the mandatory provisions of Rule 1.4(b), RGDP, and Rule 1.15(b), ORPC. During the second day of the hearing, the Presiding Master of the trial panel specifically asked the respondent if he understood he was being charged with converting his client's funds to his own use. He replied that he did not understand that. But he did not specifically object and ask for a continuance, and even if he had, he would not have been entitled to a continuance. The Complaint alleged that he had refused to return or account for client funds, and cited Rule 1.4(b) that provides in pertinent part that "a refusal to account for and deliver over such money or property upon demand shall be deemed a conversion."

¶ 21 The Bar Association must allege facts sufficient to put the accused lawyer on notice of the charges and afford the respondent ample opportunity to defend against the allegations. *State ex rel. Okla. Bar Association v. Eakin*, 1995 OK 106, ¶ 15, 914 P.2d 644, 649. But we find that the Complaint, although it could have been made clearer, supplied sufficient facts to put the respondent on notice that he was being charged with conversion of client's funds. If there were any error, the respondent would have waived it. *Eakin*, 1995 OK 106, ¶ 15, 914 P.2d at 650.

¶ 22 The respondent additionally complains that Rule 6.6, RGDP, requires that the trial panel must consist of three members.[8] The rule the respondent cited pro-

7. On July 22, 1998, the Bar Association filed an application to supplement the record, attaching an exhibit and alleging that the exhibit represented information unavailable at the time of the hearing. The respondent objects to this application to supplement the record, and accuses the General Counsel of proceeding with a frivolous case and with unprofessional conduct. Although the Court has the authority to reopen the pro-

ceedings and consider additional evidence, we do not deem it necessary in this case. *State ex rel. Oklahoma Bar Ass'n v. Bolton*, 1994 OK 53, ¶ 16, n. 19, 880 P.2d 339, 345, n. 19.

8. Rule 6.6, RGDP, provides: "Within ten (10) days after receiving notice of the filing of a complaint, the Chief Master (or Vice-Chief Master if the Chief Master is absent or otherwise fails

vides that two of the three members of the trial panel shall constitute a quorum for the purposes of conducting hearings, ruling on evidence, and rendering findings of fact and conclusions of law. Where two of the panel members are present, that is sufficient to hold the hearing. *State ex rel. Oklahoma Bar Association v. Gasaway*, 1993 OK 133, ¶ 13, 863 P.2d 1189, 1195.

## IV. FAILURE TO RESPOND TO DISCIPLINARY AUTHORITY

¶ 23  Rule 8.1(b), ORPC, provides that a lawyer shall not knowingly fail to respond to a lawful demand for information from a disciplinary authority. Rule 5.2, RGDP, provides that a copy of the grievance be served on the lawyer, who shall make a written response containing a full and fair disclosure of all the facts and circumstances pertaining to the respondent lawyer's alleged misconduct. Failure to answer within twenty days after service of the grievance, or after further time granted by the General Counsel, shall be grounds for discipline.

¶ 24  The first request for an accounting by the Office of General Counsel was by letter dated July 26, 1996. Without going into detail, several letters followed, and the respondent made promises to provide an accounting. The respondent was deposed on November 20, 1996, because his responses were unsatisfactory. More promises were made for an accounting. The final accounting was dated July 10, 1997, almost a year after it was promised to the Office of General Counsel.

¶ 25  The respondent's defense is that his computer malfunctioned and he lost the billing information in more than 50 files, including Mrs. Booth's bill. He claimed that the delay in producing a final accounting was the result of having to reconstruct her bill by examining extensive files by hand. The respondent argued that the computer malfunc-

tion was briefed extensively and exhibits were attached to support the malfunction.

¶ 26  The Bar Association answers that the respondent did not provide evidence of the computer malfunction to the trial panel. The Bar Association asserts that the respondent is confused as to when the computer crashed and that in his deposition and in the hearing before the tribunal, he gave dates of the malfunction of 1991, 1992, and 1993. Then in respondent's brief, he claimed to have been representing Mr. and Mrs. Booth for more than five years at the time of the malfunction. Since they retained the respondent in November 1991, the malfunction must have occurred in late 1996 or early 1997. But by that time, Mrs. Booth had already filed her complaint with the Bar Association after numerous attempts to obtain an accounting from the respondent.

¶ 27  The Bar Association states that although the respondent claims that he documented this computer malfunction to the Bar Association, that no such documents were received. Certainly none were entered into evidence before the trial panel, even though the panel specifically asked for the documentation. During the hearing, the respondent testified that he did not find any particular document pertaining to the computer crash.

¶ 28  But now, in his answer brief, he refers the Court to Respondent's Brief in Support of Respondent's Response to Complaint, filed November 25, 1997, and containing exhibits 11 through 18, which he claims document his computer malfunction. The documents are dated from August 24, 1996, into 1997. But in the respondent's written answer to the General Counsel's Office, dated July 8, 1997, and which is respondent's own exhibit number 4 before the trial panel, he claimed that the hard disk crashed on his computer in 1993.  It would appear from respondent's own exhibits that he cannot decide when this alleged malfunction occurred.

---

to act within such period) of the Professional Responsibility Tribunal shall select three members thereof to serve as a trial panel of Masters (hereinafter referred to as 'Trial Panel'), two of whom shall be lawyers and one shall be a non-lawyer, to hear the complaint. The Chief Master (or Vice–Chief Master) shall further designate one of the two lawyer-members of the Trial Panel to serve as Presiding Master. Two of the three Masters shall constitute a quorum for the purposes of conducting hearings, ruling on and receiving evidence, and rendering Findings of Fact and Conclusions of Law."

We find the respondent's defense to be lacking in credibility.

¶ 29 Even though respondent claims that he cooperated with the Bar Association in the investigation of this bar matter, the record shows otherwise. Long, unexcused delays in responding to the requests of the Office of General Counsel in investigating is a violation of Rule 8.1(b), ORPC, and Rule 5.2, RGDP.

## CONCLUSION

 ¶ 30 The Bar Association has proven all three counts against the respondent by clear and convincing evidence. The record reveals long delays and continuous requests by, first, Mrs. Booth, then the General Counsel for the Bar Association, and finally the trial panel for documentation supporting the respondent's claims that he had earned the substantial funds that Mrs. Booth had advanced. An examination of the record reveals the exasperation of the trial panel in attempting to obtain any documents supporting the respondent's charges for attorney's fees or his alleged computer malfunction.[9] The Bar Association characterizes the respondent's actions as intentional conversion of Mrs. Booth's funds, and the respondent answers that this proceeding is merely the result of his inadvertent loss of information because of a computer malfunction. The respondent has not been disciplined previously.

¶ 31 The respondent fails to see the seriousness of his failure to account for the funds entrusted to him by his client. He admits that he did not keep track of the amounts he had earned nor the funds which should have remained in his trust account. The primary

consideration in determining the discipline appropriate under these facts is the welfare of the public. *State ex rel. Oklahoma Bar Ass'n v. Bolton,* 1994 OK 53, ¶ 19, 880 P.2d 339, 345. While we find disbarment too harsh under this set of facts, a suspension of three years is appropriate. Accordingly, the respondent is suspended from the practice of law for three years, and assessed the costs of these proceedings in the amount of $2,632.62, to be paid within ninety days of the date this opinion becomes effective.

KAUGER, C.J., SUMMERS, V.C.J., and HODGES, LAVENDER, HARGRAVE and ALMA WILSON, JJ., concur.

WATT, J., with whom SIMMS and OPALA, JJ., join, dissenting. I would disbar this respondent from the practice of law.

---

9. The hearing, begun on January 12, 1998, was continued to February 10, 1998, and the respondent was specifically ordered to produce bank statements, canceled checks, and deposit slips for every account maintained by him, whether or not the accounts were still in existence, for the period from November 12, 1991, through July 1997, into which any funds were deposited or withdrawn that related in any way to his representation of Mr. and Mrs. Booth. He was further ordered to bring all time records relating such representation, and documentation of the computer crash. The respondent brought related and unrelated material, all of which was unorganized. He was then ordered to organize it in a form that could be readily received and reviewed

by the trial panel. By the date of the second hearing, he still had not done so. The trial panel sent him during the lunch recess, to retrieve the documents the respondent had previously been ordered to retrieve. In its report to this Court, the trial panel stated that the respondent's conduct in violation of the above cited rules, "coupled with his utter unwillingness and disregard for the trial panel's request that he produce documents to substantiate his sworn testimony, in addition to his apparent lack of understanding or acknowledgment of the seriousness of his offenses, calls into serious question his professional fitness to deal with the public as a practitioner of law."