OSCN Found Document:STATE ex rel. OKLAHOMA BAR ASSOCIATION v. WEIGEL

 
 
 
 OSCN navigation


 
 Home

 
 Courts

 
 Court Dockets

 
 Legal Research

 
 Calendar

 
 Help
 





 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 

 
 
 
 STATE ex rel. OKLAHOMA BAR ASSOCIATION v. WEIGEL
2014 OK 4
Case Number: SCBD-5864
Decided: 02/04/2014
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2014 OK 4, __ P.3d __

STATE OF OKLAHOMA ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,
v.
JOHN HOLMAN WEIGEL, Respondent.



ATTORNEY DISCIPLINARY PROCEEDING



¶0 The Oklahoma Bar Association filed a Rule 6 proceeding against the Respondent, John Holman Weigel, alleging violations of the Oklahoma Rules of Professional Conduct and the Rules Governing Disciplinary Proceedings. A formal hearing was held before a trial panel of the Professional Responsibility Tribunal, which recommended to the Court that Respondent be suspended from the practice of law for six (6) months. The Complainant recommended suspension for two years and one day. Having reviewed the matter de novo, we suspend the Respondent from the practice of law for two years.



RESPONDENT SUSPENDED FOR TWO YEARS AND
ORDERED TO PAY COSTS.



Loraine Dillinder Farabow, First Assistant General Counsel, OKLAHOMA BAR ASSOCIATION, Oklahoma City, Oklahoma, for the Complainant.
Jack S. Dawson, MILLER DOLLARHIDE, P.C., Oklahoma City, Oklahoma, for the Respondent.




EDMONDSON, J.


¶1 The Oklahoma Bar Association (Bar) filed on August 21, 2012, an amended formal complaint pursuant to Rule 6.1, Rules Governing Disciplinary Proceedings (RGDP), 5 O.S. 2011, ch. 1, app. 1-A, against John Holman Weigel (Respondent), alleging six (6) counts of professional misconduct in violation of the Oklahoma Rules of Professional Conduct, 5 O.S. 2011, Ch. 1, app. 3-A, (ORPC) and the RGDP. The parties filed Joint Stipulations, but the Respondent denies the stipulated conduct violated any rules of professional conduct or disciplinary procedure and contends professional discipline is not warranted. The allegations set out below are taken from the stipulated facts.

COUNT I - The Boyd Grievance

¶2 The Bar received a grievance from Peggy Jean Boyd on October 26, 2009, regarding the Respondent's representation of her son, Roger D. Boyd. The Bar opened Boyd's grievance for informal investigation and by letter dated November 3, 2009, advised the Respondent of the grievance and requested a response in writing within two weeks. No response was received and the Bar on November 25, 2009, mailed another letter to the Respondent at his official roster address, advising him of his failure to respond to the Boyd grievance and requesting that he do so within five (5) working days from the date of the letter. The Respondent did not respond. By letter of December 23, 2009, the Bar advised it was opening Boyd's grievance for formal investigation and informed the Respondent he was required to respond in writing within twenty (20) days. He responded by letter dated January 8, 2010, and apologized for the delay in his initial response. The Bar alleged violation of Rule 8.1(b) of the ORPC and Rules 1.3 and 5.2 of the RGDP for failure to respond to the Boyd grievance.

COUNT II - The Whiteley Grievance

¶3 On July 8, 2009, Cody Alan Whiteley hired the Respondent to represent him in a paternity action pending in Jackson County, Oklahoma. The contract provided that Whiteley would pay a "flat fee" of $12, 000.00, with $6,000.00 due immediately, then payments of $1,000.00 per month until paid in full. The Respondent did not have a trust account. At Respondent's specific request, Whiteley's mother wired $6,000.00 to the Respondent's account with the First State Bank of Altus on July 8, 2009, and then wrote the Respondent a check for $1,000.00 on August 12, 2009, which was deposited into the same account. After the $6,000.00 deposit, the Respondent made numerous disbursements of funds from the general account for personal and business expenses.

¶4 On August 27, 2009, the Respondent met with Cody Whiteley in Texas after Whiteley's mother threatened to stop making any further payments and sought to remove herself as Cody's guarantor. The Respondent admits meeting with Whitely but denies it was under threat. The Whiteleys left numerous telephone messages and sent repeated emails expressing their concern that no action had been taken. The Respondent failed to timely respond to their repeated requests about the status of the case. By certified mail dated November 3, 2009, the Whiteleys terminated the Respondent and requested a refund and return of Cody's file. The Respondent did not claim the certified mailing and did not respond to the Whiteleys' request. The Respondent did not provide the Whiteleys with an accounting and he denies that a refund was requested. On November 26, 2009, Cody Whiteley filed a grievance with the Bar alleging neglect of his legal matter and failure to earn the $7,000.00 paid.

¶5 The Bar alleged violations of Rules 1.1, 1.3, 1.4, 1.5, 1.15, 1.16(d) and 3.2 of the ORPC and Rule 1.3 of the RGDP, asserting the Respondent accepted a flat fee from the client, which he deposited in his operating account, and then failed to properly communicate with the client or to complete the work necessary to earn the fee. The Respondent claimed Whiteley was a difficult client who was hard to communicate with. After the Bar requested him to provide an accounting of the work performed on Whiteley's behalf and a copy of all work product, Weigel responded, by letter from his attorney, asserting the contract was for a flat fee and he earned the entire fee. He admitted he did not have a trust account, but argued he was not required to maintain one because the fee was earned when paid.

COUNT III - The DeLeon Grievance

¶6 Tomas DeLeon, III, was convicted on August 19, 2003, in Stephens County District Court, of five counts of lewd molestation. He was sentenced to serve sixteen years imprisonment and his conviction was affirmed on state and federal appeals. DeLeon's mother spoke with the Respondent on January 28, 2010, to see whether anything further could be done in her son's case. The Respondent assured her he could help, even if it meant getting a pardon, and the fee would be $5,000.00. Mrs. DeLeon wired $1,000.00 to Respondent's general account. On February 17, 2010, DeLeon's parents drove from Texas to meet with the Respondent in Altus, at which time he stated three options were available: to seek a pardon, to seek a commutation of the sentence, or to seek a modification of the sentence. He advised them it would take six or eight weeks for him to seek the desired result. The Respondent denies he assured them a result.

¶7 The DeLeons would testify they paid the Respondent an additional $4,000.000 by cashier's check, executed a contract with him and turned over their son's legal papers to him. The contract provided for a flat fee of $5,000.00 for the Respondent to represent, appear and act for his client on all currently available administrative and executive remedies relating to his conviction in CF-03-149 in Stephens County, Oklahoma. It provided that all fees were nonrefundable due to time constraints on the attorney and the complexity of the case, but no further fees would be required under the contract. The Respondent told the DeLeons he would notify the prison of his representation and he would call and speak to Tomas. He would either take the necessary documents to the prison or mail them for Tomas to execute. From February 17, 2010, until May 12, 2010, the Respondent did not communicate with Tomas or with the DeLeons. On May 12, 2012, the Respondent answered the phone and told Mrs. DeLeon he would call her the next day at 5:00 p.m. He did not call and Mrs. DeLeon repeatedly left messages requesting that he contact her.

¶8 On May 26, 2010, Mrs. DeLeon called from a different phone number and the Respondent answered, but told her to call the next day to make an appointment. The next day, Mrs. DeLeon telephoned the Respondent approximately nine times without getting an answer. On June 9 the DeLeons drove to Respondent's home/office in Altus and repeatedly rang the doorbell, but the Respondent did not answer. They called from a nearby payphone and when the Respondent answered he said he had just come home. When she said his car was parked in the driveway when they came by, he said he had been asleep. They drove back to his home and talked to him outside, asking to see the work he had done. The Respondent told them he would have everything done by June 12, 2010, and arranged to meet with them at 10:00 a.m. that day at his home to show them the paperwork.

¶9 On June 12, he gave the DeLeons a one and one-half page letter addressed to "Dear ______," with no name or address listed. This was purportedly an "Application for Commutation/Parole Consideration of Tomas DeLeon, III." He told them that he had done all he could for their son and demanded they sign a paper releasing him from all obligations. They refused and asked for a copy of the release, but the Respondent refused to give them a copy if they weren't going to sign it. He told them he would have their son's paperwork completed by June 14, 2010, and would mail it to them. Mrs. DeLeon did not receive any paperwork and when she contacted the Respondent he said he had mailed it. He said he would put another copy in the mail and he then hung up on her. Mrs. DeLeon immediately called back and advised the Respondent they no longer wanted his services. She requested return of her son's legal documents and a refund of their money. The Respondent again hung up on her.

¶10 On June 22, 2010, the Respondent gave them the same letter, with a few extra lines added. He did not return the files or make any refund. On July 6, 2010, the DeLeons filed a grievance and the Bar advised the Respondent of the investigation. On August 2, 2010, the DeLeons went to the Respondent's home to pick up their sons's legal documents. He refused to give them the files unless they signed a "Receipt and Acknowledgment." They refused to sign and the Respondent then presented them with a "Statement of Services Rendered" which reflected they owed him an additional $812.50, although he said he was not going to ask them to pay it. The DeLeons would testify the Respondent gave them a large box containing their son's records which appeared to have cat feces and urine on them.

¶11 In his response to the Bar dated August 9, 2010, the Respondent stated he had explained to the DeLeons at the outset that the chances for relief were remote because the case had been through state and federal appeals for nearly seven years and the file was voluminous. He states the DeLeons decided to hire him on February 17, 2010, with the specific provision that all fees would be on a flat flee basis and were nonrefundable. The response enclosed a "Statement of Services Rendered" which stated that he spent 25.25 hours on the case at a rate of $250.00 per hour.

¶12 The DeLeons sued the Respondent in Jackson County District Court, and on August 25, 2010, the court ordered the Respondent to pay them $2,301.75 in restitution and court costs. Respondent gave them a cashier's check for that amount as a settlement of the matter. The Bar alleged violations of Rules 1.1, 1.3, 1.4, 1.5, 1.15, 1.16(d) and 3.2 of the ORPC and Rule 1.3 of the RGDP, asserting the Respondent accepted a flat fee from the client and deposited the fee in his operating account, failed to properly communicate with the client and failed to competently complete the work necessary to earn the fee. The Respondent admitted he accepted a flat fee but he claimed the fee was earned at the time of payment.

COUNT IV - The Owens Grievance

¶13 In Count IV, the Bar alleged the Respondent violated Rules 1.1, 1.3, 1.4, 3.2, 8.4(d) of the ORPC and Rule 1.13 of the RGDP, by accepting a flat fee from the client, then failing to properly communicate with the client or to diligently and properly complete the work for which he had been paid. On April 13, 2010, Michael Owens hired the Respondent to represent him in Case No. FD-2001-32, a custody and child support modification matter in the District Court of Jackson County. Owens paid the Respondent $1,900.00 between April 13 and June 15, 2010. The Respondent filed a motion to modify the decree of divorce and an application for an emergency ex parte custody order. A temporary order granted custody to Owens and set the matter for hearing on August 24, 2010. On September, 13, 2010, the court ordered child support in Owens' favor and directed opposing counsel, Talley, to prepare the order. Talley requested necessary information concerning Owens' income, but the Respondent never provided the documents. As a result, Owens was required to continue to pay child support under the former court order. Owens stated the Respondent advised him to stop paying child support since the child was living with him and stated he would contact the Texas Department of Human Services to let them know that a new order was being prepared. Owens stopped paying and the State of Texas began to garnish his wages in the amount of the original child support, plus an additional $50.00 per month because of an arrearage of $750.00 When contacted, the Respondent made excuses and blamed opposing counsel for causing the delay in filing the order.

¶14 Owens filed a grievance against the Respondent on January 24, 2011, alleging neglect and lack of diligence getting the order filed. The Respondent blamed Owens and Talley for the delay. He stated he had sent the information to Talley but it was not received, so he was required to obtain updated information from Owens. Wilma Owens responded she had promptly faxed the financial documentation to the Respondent on at least three (3) occasions. She contacted the State of Texas and was advised there was no documentation that the Respondent had ever notified them of the temporary order. The Respondent advised he would file a Motion to Settle Journal Entry and forward a copy to the Bar. He did not do so and continued to blame Talley. He advised the Bar that he had contacted the Texas child support authorities on several occasions on Owens' behalf.

COUNT V - The Lara Grievance

¶15 In Count V, the Bar alleged Respondent's conduct violated Rules 1.1, 1.3, 1.4, 1.5, 1.15, 1.16(d), 3.2 and 8.4(d) of the ORPC and Rule 1.3 of the RGDP by accepting a flat fee from the client, depositing the fee into his operating account and then failing to properly communicate with the client or to competently complete the work necessary to earn the fee. Jose Lara hired the Respondent in May of 2011 to represent him in a custody and child support modification in Harmon County, Oklahoma. He paid the Respondent a total of $2,300.00, which the Respondent deposited into his general account. The Respondent attended an initial child support hearing on November 14, 2011, but never filed any pleadings in either matter and failed to communicate with Lara as to the status of his legal matters. Lara was the Respondent's neighbor and made several attempts by telephone and visiting Respondent's home unannounced in an effort to discover the status of his case.

¶16 In early 2012, the Respondent moved to Texas and ceased communications with Lara. On May 16, 2012, Lara filed a grievance against the Respondent, alleging neglect of his legal matters, failure to return his file and failure to return his fee so that he could hire another attorney. In his response to the Bar, the Respondent advised he had the custody matter prepared and ready to file and that he scheduled a meeting with Lara for June 11, 2012. At that meeting, Lara terminated representation by the Respondent and requested a return of his file and unearned fees. The Respondent provided Lara with a check for $1,300.00. The Respondent filed a response with the Bar on June 28, 2012, in which he enclosed a copy of part of Lara's file and an accounting in which he estimated he had performed $3,260.00 in legal services for Lara. He included a photocopy of the refund to Lara, and stated he would regard the $2,260.00 balance due as waived for client goodwill.

COUNT VI - the Williams Grievance

¶17 In Count VI, the Bar alleged conduct in violation of Rules 1.1, 1.3, 1.4, 1.5, 1.15, 1.16(d), 3.2 and 8.4(d) of the ORPC and Rule 1.3 of the RGDP by accepting a flat fee from the client, depositing the fee into his operating account and then failing to properly communicate with the client or to competently complete the work necessary to earn the fee. Priscilla Williams was incarcerated when her husband filed for divorce and custody of their minor child. A decree of dissolution of marriage was filed in Harmon County District Court Case No. FD-2010-11. In November 2010, she hired the Respondent for a flat fee of $2,500.00, which was paid by her mother. The parties reconciled shortly thereafter and Williams attempted to contact the Respondent on numerous occasions to tell him his services were no longer needed. Finally, Williams left a message terminating his services and requesting a refund. The Respondent did not communicate with her and he did not refund the fee. The parties had their divorce decree vacated on January 5, 2011, and Williams continued to leave messages with the Respondent to contact her and refund her fee. In late 2011, Williams left a message telling the Respondent she was going to file a grievance with the OBA. The Respondent returned her call and asked to meet to discuss the matter. At the meeting, the Respondent asked Williams to sign a document waiving any legal claim against him and agreeing not to contact the OBA. Williams refused to sign the paper and the Respondent told her he would keep her money in the event she needed legal services in the future.

¶18 Williams was again incarcerated in February 2012 and her husband sued her for divorce on April 19, 2012. She contacted the Respondent to represent her. He said he would and asked her to e-mail details of the issues presented. Williams e-mailed the requested information and then again responded to five more questions asked by the Respondent. He stopped communicating with her and on May 28, 2012, Williams blocked her telephone number and phoned the Respondent. The Respondent answered and advised that he would represent her only if she agreed to an uncontested divorce on the terms offered by the husband's attorney. She refused and demanded a refund. He said he would give only a partial refund, if any. Williams appeared pro se at trial in her divorce on July 31, 2012, at which time she lost custody of her child. Opposing counsel advised the Bar the Respondent never contacted him on behalf of Mrs. Williams. The Respondent did not provide an accounting or a refund of the $2,500.00 to Williams or her mother.

¶19 These matters were presented to the Professional Responsibility Tribunal (PRT) on November 2, 2012, November 20, 2012, and February 28, 2013, the Respondent appearing in person and by his attorney of record. Ultimately, the PRT found the Bar established by clear and convincing evidence the Respondent committed specific acts constituting professional misconduct in violation of Rules 1.1, 1.3, 1.4, 1.5, 1.15, 1.16(d), 3.2, 8.1 and 8.4(d) of the ORPC,[1] and Rules 1.3 and 5.2 of the RGDP.[2] It now recommends the Respondent be suspended from the practice of law for six months. The Bar argues the appropriate discipline is suspension for two years and one day, which would be tantamount to disbarment and would require the Respondent to apply for reinstatement of his license to practice law. The Respondent says his conduct warrants nothing more severe than a reprimand.

STANDARD OF REVIEW

¶20 In bar disciplinary proceedings, this Court exercises exclusive original jurisdiction as a licensing court, not as a reviewing tribunal. State ex rel. Oklahoma Bar Ass'n v. Berger,2008 OK 91 ¶12, 202 P.3d 822. It is our responsibility to examine the record and assess the credibility and weight of the evidence in order to determine whether it clearly and convincingly establishes professional misconduct by the attorney and, if so, what the appropriate discipline, if any, should be. State ex rel. Oklahoma Bar Ass'n v. Stutsman, 1999 OK 62, 990 P.2d 854, 858. Our review is de novo and we are not bound by the recommendations of the PRT. State ex rel. Oklahoma Bar Ass'n v. Todd, 1992 OK 81, 833 P.2d 260, 261.

¶21 As for failure to respond to the Bar's requests for information, the Respondent argues the rules do not require a response to an informal complaint from the Bar within two weeks. We have held that a lawyer's obligation to respond to an OBA grievance is mandatory and failure to respond is a violation of the RGDP which forms a basis for discipline. State ex rel. Okla. Bar Ass'n v. Stow, 1998 OK 105, ¶12, 975 P.2d 869; State ex rel. Okla. Bar Ass'n v. Spadafora, 1998 OK 28, ¶ 32, 957 P.2d 114, 119. The Bar established by clear and convincing evidence that the Respondent failed to respond to the grievance filed in the Boyd matter until a formal proceeding was instigated.

¶22 The Respondent maintains his fees were earned in each instance. He says he spent many hours meeting with clients and reviewing their files and that he also traveled to meet with certain clients. He says he expended time on each client's legal matter and his fees were reasonable. He argues that he was not required to maintain a trust account because the fixed fees he charged were earned upon receipt and thus could not be deposited in a trust account. He relies upon OBA Ethics Opinion No. 317, adopted December 13, 2002, for support. That opinion addressed availability fees, fixed fees and hourly fees designated as a nonrefundable retainer. The use of the term "nonrefundable retainer" to represent an advance payment of fees for hours of legal services that the attorney will perform in the future is impermissible. Such fees may be designated as fixed fees, but cannot impair a client's rights under Rule 1.16(d). The fees are not "nonrefundable" because if the attorney withdraws or is terminated before completing the work, the attorney must refund the unearned portion of the advance.[3]

¶23 In McQueen, Rains & Tresch, LLP v. CITGO Pet. Corp., 2008 OK 66, 195 P.3d 35, we discussed nonrefundable retainer fees and related provisions in attorney/client contracts that have been upheld in other jurisdictions. The common factors were: the fees set out were reasonable; the contract was negotiated with a sophisticated client and the retainer agreement contained an agreement by the client to compensate the lawyer if the client terminates the relationship; the contract is in writing with a clear statement of the consequences of the provisions; where the attorney, in entering the contract, has changed positions or incurred expenses to meet the needs of the client or where the client's desire to have a particular attorney as a representative necessitates an immediate commitment at the risk to the attorney of forgoing or losing other potential business. Id. Contracts between attorneys and their clients regarding compensation stand on the same footing as any other contract and are upheld unless contrary to law, oppressive, fraudulent or the fee is obviously disproportionate to the services rendered. Rule 1.5 prohibits an attorney from making an agreement for an unreasonable fee. Comment 4 to Rule 1.5 states that a demand for advance payment may be made by the lawyer, but that any unearned portion of the collected fee must be returned.

¶24 The Respondent had fee contracts in the Whiteley and DeLeon matters The Whiteley contract provided that the Respondent would be paid $12,000.00 as a retainer, with payments of $1,000.00 per month to be paid after an initial payment of $6000.000. The Whiteleys paid the Respondent $7,000.00. The contract did not provide for a nonrefundable fee nor did it state that the fees were deemed earned upon receipt. The Respondent did not file any pleadings or other paperwork with regard to the case, not even an entry of appearance. His testimony was that "it was in the planning stages." The Respondent did not keep contemporaneous records, nor did he make written notes of contact with his client. There is no documentary evidence to support the Respondent's testimony that he was waiting on the client for further instruction, or that the client had agreed all pleadings would be filed simultaneously. The testimony reflects otherwise. The Respondent did not provide an accounting and he did not refund any of the $7,000.00 paid him. When the Bar requested an accounting, the Respondent produced, after several months, one he had created from memory.

¶25 The DeLeon contract provided for a nonrefundable flat fee. The Respondent believes he earned his $5,000.00 fee although he admits only one hour of the 23.25 hours billed was spent drafting a cover letter to the Oklahoma Pardon Board (sic) members. From February 17 to May 12, there were no communications with the clients. Twelve of the 23.25 hours were spent reviewing the extensive file and creating a compilation of it. The DeLeons obtained a small claims judgment against him in the amount of $2,301.75, which he agreed to pay in settlement.

¶26 The Bar proved by clear and convincing evidence the Respondent took fees from clients and did not complete the work for which he was hired. A violation of Rule 1.15(a) is established by the Respondent's failure to hold his clients' property separate from his own property. An advance fee retainer requires that the property of the client must be segregated until it is earned. State ex rel. Okla. Bar Ass'n v. Sheridan, 2003 OK 80, 84 P.3d 710, 717. The Respondent deposited client funds in his operating account, in violation of Rule 1.15. The Respondent's bank records reflect that after he deposited the client funds, cash withdrawals were made and checks were drawn on the account almost immediately for personal items. The Respondent failed to account for or return fees upon demand by clients. He failed to provide adequate representation and to act with reasonable diligence in representing his clients. He failed to keep the clients reasonably informed and he failed to promptly comply with reasonable requests for information from them. The Respondent's conduct violates Rules 1.1, 1.3, 1.4, 1.5, 1.15, 1.16(d), 3.2, 8.1 and 8.4(d), ORPC and Rules 1.3 and 5.2 RGDP.

¶27 Violation of the Oklahoma Rules of Professional Conduct and Rules Governing Disciplinary Procedure warrants the imposition of professional discipline. It is the duty of this Court to determine the appropriate level of discipline to be imposed, based on the facts and circumstances of the case. In determining the appropriate discipline, we look to the level of discipline imposed in other cases. The amount of discipline imposed has depended upon the unique factors in each case. Misuse of trust funds has resulted in the most severe discipline of disbarment.[4]

¶28 In State ex rel. Okla. Bar Ass'n v. Perkins, 1988 OK 65, 765 P.2d 825, failure to promptly repay client funds upon request, coupled with other misuses of client fund, mitigating circumstances absent, resulted in disbarment. A failure to account for or deliver money to the client upon demand may constitute a conversion. Funds belonging partly to a client and in part to the lawyer must be deposited in the lawyer's trust account. The portion belonging to the lawyer may be withdrawn when due unless the right of the lawyer to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved. Id. Mr. Weigel, in the present matter, did not maintain a trust account until the Bar advised him that he was required to have one. Client funds were deposited in his general account because he believed those fees to be earned when paid.

¶29 In State ex rel. Okla. Bar Assn's v. Schraeder, 2002 OK 51, 51 P.3d 570, a thirty-day suspension was deemed appropriate for the attorney's failure to promptly respond to the Bar's investigative inquiries, lack of concern for clients' economic interests as evidenced by refusing to promptly account for and restore unearned portions of fees for almost three years and disregard of his client's right to know status of case. Schraeder insisted that he filed no briefs or pleadings because he was waiting to receive pertinent information from the client's family in order to proceed with his criminal appeal. He did not respond to a letter requesting a detailed accounting and a refund of the unearned portion of the $2,800.00 fee because he believed that he had earned the fee by researching the various issues in the appeal, speaking to members of the client's family on several occasions and traveling twice to visit his client at the Adult Detention Center in Tulsa. Schraeder admitted that his conduct violated Rules 1.4, 1.5, 1.15(b), 1.16(b)(2) and (d), Rule 8.4(a) ORPC and Rule 1.3 RGDP. Schraeder offered in mitigation that he had not been previously disciplined and that he suffered from "burnout syndrome." We noted that his actions caused no grave economic harm. Schraeder acknowledged and accepted responsibility for his professional derelictions and, although his responses were dilatory during the initial investigative stages, they were characterized by candor and cooperation during the latter stages and in the PRT proceedings. We took the mitigating factors into account in fashioning the appropriate measure of discipline at suspension for thirty (30) days.

¶30 In State ex rel. Okla. Bar Ass'n v. Sheridan, 2003 OK 80, 84 P.3d 710, the attorney was suspended for six months for violations similar to those alleged against the Respondent. Sheridan deposited the client's money in his operating account. Rule 1.16 and 1.15(b) require a lawyer not only to refund advance fees not earned but to do so in a timely manner. Many of the allegations against Sheridan came as a result of his failure to supervise an employee. Sheridan's primary faults were deemed to be neglect of clients, not following through with his responsibilities to his clients, mishandling his clients' money, not refunding unearned fees and not communicating with the Bar.

¶31 A three-year suspension was deemed appropriate in State ex rel. Okla. Bar Ass'n v. Stow, 1998 OK 105, 975 P.2d 869, for conversion of client funds where the attorney used a client's funds for his own use and refused to account for or deliver funds of a client upon demand. Additionally, he did not respond to several requests for accounting made by the Bar; when he did respond, the accounts were unsatisfactory. In State ex rel. Okla. Bar Ass'n v. Reynolds, 2012 OK 95, 289 P.3d 1283, the attorney was suspended for two years and one day on five counts of neglect of cases, failing to keep clients informed of the status of their cases, collecting and retaining fees for which little or no services were provided and failure to respond to the grievances. At the time, Reynolds stood suspended for failure to complete the MCLE requirements. Reynolds admitted that she basically abandoned all of her pending cases in October 2010. She testified that she had problems with depression, but the trial panel found there were no mitigating factors presented.

¶32 In the present matter, the Respondent was admitted to the practice of law in Oklahoma on April 21, 2000, and has not been previously disciplined. At the hearing before the PRT, the Respondent for the first time offered in mitigation that he has suffered from bipolar disorder since 2002. He was treated through counseling and with medication from 2008 to 2009. The Respondent testified that the disorder did not render him incapable of practicing law, but only created difficulties in his law practice. The Respondent's counsel advised the trial panel that "Rule 10 is not an issue here whatsoever." Tr. 2-28-13 p. 492.[5] A disability does not immunize one from disciplinary measures and there must be shown a causal relationship between the condition and the professional misconduct. State ex rel. Okla. Bar Ass'n v. McCoy, 2010 OK 67, ¶25, 240 P.3d 675. The Respondent did not raise Rule 10 as a defense and we have not considered factors involved in a Rule 10 proceeding. State ex rel Okla. Bar Ass'n v. Young, 2007 OK 92, ¶39, 175 P.3d 371.

¶33 The Respondent does not express remorse for the difficulties he caused to his clients, nor does he admit he did anything wrong. He admitted he could have "handled things better," but he does not believe his conduct forms a basis for discipline. He denies any wrongdoing and denies he violated any of the rules of professional conduct or disciplinary proceedings. Even after being ordered by a court to refund $2,301.75 to the DeLeons, the Respondent still believes the entire fee was earned. We find the circumstances warrant the Respondent's suspension from the practice of law in Oklahoma for a period of two years. The Respondent actively avoided answering or establishing contact with his clients and he engaged in a pattern of behavior that was detrimental to them.

¶34 The Bar has filed an application to assess costs against the Respondent in the amount of $4,892.00, which includes $85.70 for lunch provided to the PRT. This Court does not find it appropriate to assess as costs the amount the members of the PRT spent on lunch during the three days of the hearing. State ex rel. Okla. Bar Ass'n v. Wilcox, 2014 OK 1, ¶ 57, ___ P.3d ___. The amount of $85.70 is deleted and the Respondent is ordered to pay costs of the proceeding in the amount of $4,806.30 within ninety (90) days of the date the opinion becomes final.


RESPONDENT SUSPENDED FOR TWO YEARS AND
ORDERED TO PAY COSTS.



¶35 COLBERT, C.J., REIF, V.C.J., KAUGER, WINCHESTER, EDMONDSON,
GURICH, JJ. - Concur

¶36 WATT, TAYLOR and COMBS, JJ., - Dissent






TAYLOR, J., with whom WATT and COMBS, JJ., join, dissenting.


" I would impose suspension for two years and one day."





FOOTNOTES


[1] Rule 1.1 provides that a lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation; Rule 1.3 provides that a lawyer shall act with reasonable diligence and promptness in representing a client; Rule 1.4 provides that a lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information, and that a lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation; Rule 1.5 provides that a lawyer shall not make an agreement for, charge or collect an unreasonable fee or unreasonable amount for expenses; Rule 1.15. Oklahoma Rules of Professional Conduct - Safekeeping Property

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyers own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated or elsewhere with the written consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

Rule 1.16(d) provides that upon termination of representation the lawyer shall take steps to protect a client's interests, such as giving reasonable notice to the client, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expenses that has not been earned or incurred; Rules 3.2 provides that a lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client. Rule 8.1 concerns maintaining the integrity of the profession and provides that in a disciplinary matter, a lawyer should not knowingly fail to respond to a lawful demand for information from a disciplinary authority. Rule 8.4(d) provides that it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.



[2] Rule 1.3. Discipline for Act Contrary to Prescribed Standards of Conduct. 

The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline.

Rule 5.2 provides that the failure of a lawyer to answer within twenty (20) days after service of a grievance shall be grounds for discipline.



[3] The ethics opinion noted that fixed fees paid in advance are intended to cover a specified amount of work estimated by the attorney for a particular matter. Clients often prefer fees determined in advance to be a specified sum because it allows the client to know in advance just how much the total cost for legal services will be, permitting the client to budget based on a fixed sum rather than face potentially unlimited hourly fees that may exceed the client's ability to pay. The opinion notes that in some situations a flat fee may be determined based on an attorney's "towering reputation" for making a civil case vanish just by agreeing to the representation, or resolving a criminal matter with a few telephone calls. Having obtained the desired result, the attorney is entitled to keep the fee. Even if the result is not particularly successful, if the fee is reasonable, the terms have been adequately explained to the client in the fee contract and the services agreed upon have been performed, the lawyer ordinarily will not be required to refund any of the fee to the client (emphasis added).



[4] Disbarment was deemed the appropriate level of discipline for trust fund misuse in State ex rel. Okla. Bar Ass'n v. Young, 2007 OK 92, 175 P.3d 371. Young was charged in two counts of misconduct. Young used his trust account as an operating account and as a personal account and admitted misuse of his trust account and violation of the rules. He failed to competently represent and earn the fees charged and he failed to keep the client reasonably informed. He obtained permission from a medical center to endorse the settlement check on its behalf. He did not pay the medical center and did not return their calls. The check that he subsequently wrote from his trust account was returned for insufficient funds.



[5] Rule 10, RGDP

10.2. Suspension. 

Whenever it has been determined that a lawyer is personally incapable of practicing law, his license to practice shall be suspended until reinstated by order of this Court.









 Citationizer© Summary of Documents Citing This Document
Cite
 Name
 Level
 None Found.
Citationizer: Table of Authority
Cite
 Name
 Level
 Oklahoma Supreme Court Cases Cite
Name
Level 1988 OK 65, 757 P.2d 825, State ex rel. Oklahoma Bar Ass'n v. Perkins
Cited 1992 OK 81, 833 P.2d 260, 63 OBJ 1714, State ex rel. Oklahoma Bar Ass'n v. Todd
Discussed 2002 OK 51, 51 P.3d 570, STATE EX. REL. OKLAHOMA BAR ASSOCIATION v. SCHRAEDER
Discussed 2003 OK 80, 84 P.3d 710, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. SHERIDAN
Discussed at Length 2007 OK 92, 175 P.3d 371, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. YOUNG
Discussed at Length 2008 OK 66, 195 P.3d 35, McQUEEN, RAINS & TRESCH, LLP v. CITGO PETROLEUM CORP.
Discussed 2008 OK 91, 202 P.3d 822, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. BERGER
Discussed 2010 OK 67, 240 P.3d 675, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. McCOY
Discussed 2012 OK 95, 289 P.3d 1283, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. REYNOLDS
Discussed 2014 OK 1, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. WILCOX
Cited 1998 OK 28, 957 P.2d 114, 69 OBJ 1207, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. SPADAFORA
Discussed 1998 OK 105, 975 P.2d 869, 69 OBJ 3611, State ex. rel. Oklahoma Bar Association v. Stow
Discussed at Length 1999 OK 62, 990 P.2d 854, 70 OBJ 2093, State ex. rel. Oklahoma Bar Ass'n v. Stutsman
Discussed