2003 OK 80

**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**John H.T. SHERIDAN, Respondent.**

**SCBD No. 4735.**

Supreme Court of Oklahoma.

Sept. 30, 2003.

Rehearing Denied Feb. 18, 2004.

Nathan A. Lockhart, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, OK, for the Complainant.

Jim F. Gassaway, Tulsa, OK, for Respondent.

HODGES, J.

¶ 1 Complainant, the Oklahoma Bar Association (OBA), alleged eleven counts of misconduct warranting discipline against respondent attorney, John H.T. Sheridan (Respondent). One of the counts was withdrawn, leaving ten counts for this Court's consideration. The complaint alleged that Respondent had violated rules 1.1,[1] 1.2,[2] 1.3,[3] 1.4,[4] 1.5(a),[5] 1.8(h),[6] 1.15,[7] 1.16,[8] 3.2,[9] 5.3,[10] 7.1,[11] 7.5,[12] 8.1,[13] and 8.4[14] of the Oklahoma

1. Rule 1.1 of the ORPC requires a lawyer to "provide competent representation to a client."

2. Rule 1.2 of the ORPC requires a lawyer to "abide by a client's decisions concerning the objectives of representation."

3. Rule 1.3 of the ORPC provides: "A lawyer shall act with reasonable diligence and promptness in representing a client."

4. Rule 1.4 of the ORPC charges a lawyer with the duty to "keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information."

5. Rule 1.5(a) of the ORPC provides: "A lawyer's fee shall be reasonable."

6. Rule 1.8(h) of the ORPC requires a lawyer to advise an unrepresented client or former client in writing that independent representation is appropriate before settling a claim limiting the lawyer's liability for malpractice.

7. Rule 1.15 of the ORPC demands that a lawyer hold a client's funds in a trust account separate from the lawyer's property and promptly deliver a client's funds after rendering an accounting.

8. Rule 1.16(d) of the ORPC provides:

Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned.

9. Pursuant to rule 3.2 of the ORPC, "[a] lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client."

10. Rule 5.3 of the ORPC provides:

With respect to a nonlawyer employed or retained by or associated with a lawyer:
(a) a partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;
(b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and
(c) a lawyer shall be responsible for the conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:
(1) the lawyer order or, with the knowledge of the specific conduct, ratifies the conduct involved; or
(2) the lawyer is a partner in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

11. Rule 7.1 of the ORPC provides:

(a) A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false of misleading if it is:
(1) a communication which contains a material misrepresentation of fact or law, or omits information necessary to make the communication, considered as a whole, not materially misleading. . . .

12. Rule 7.5(c) prohibits the use of "[t]he name of a lawyer holding a public office . . . in the name of a law firm, or in communications on its behalf, during any substantial period in which the lawyer is not actively and regularly practicing with the firm." Rule 7.5(d) prohibits lawyers from stating or implying "that they practice in a partnership or other organization unless that is the fact." The comments elaborate that "it is misleading to use the name of a lawyer not associated with the firm or a predecessor of the firm."

13. Rule 8.1 of the ORPC provides: "[A] lawyer . . . in connection with a disciplinary matter, shall not . . . knowingly fail to respond to a lawful demand for information from . . . [a] disciplinary authority. . . ."

14. Under rule 8.4 of the ORPC,

It is professional misconduct for a lawyer to:

Rules of Professional Conduct (ORPC),[15] and rules 5.2 [16] and 5.3 [17] of the Rules Governing Disciplinary Proceedings (RGDP).[18] The parties stipulated to some of the facts. Testimony concerning the remaining facts was presented at a hearing before the Professional Responsibility Tribunal (PRT).

## I. FACTS

### A. HISTORY

¶ 2 Respondent first was licensed to practice law in Oklahoma in 1984. He worked in a law firm in Tulsa with several other attorneys until 1996 when he moved to Muskogee to practice law. In 1998, he began practicing law with his brother in Coweta. In 2000, the brother left the firm, as did his brother's wife who had been acting as his legal secretary and paralegal. Debbie Sheridan (Debbie), Respondent's ex-wife, also worked for the firm. When Respondent's brother and his brother's wife left the firm, Debbie's job responsibilities increased. Respondent claims this is when the problems began.

### B. COUNT I

¶ 3 On March 7, 2001, Robert and Linda Singleton retained Respondent to represent them concerning a property easement.[19] The Singletons had temporally allowed Mr. Kifer, an elderly neighbor, to use their bridge and their property for ingress and egress to his property. Mr. Kifer was to construct a bridge on his property. However, when he became ill, the Singletons continued to allow him to use their property but were concerned that Mr. Kifer's heir might assert a right to continued use of the property.

¶ 4 The Singletons retained Respondent, who agreed with the Singletons that time was of the essence. Respondent's flat fee was $750 with an additional $750 if the matter had to be litigated. There was no written agreement between the Singletons and Respondent. Respondent testified that Mr. Singleton seemed hesitant to proceed. Although the Singletons thought a letter to the heirs would be sufficient, Respondent was convinced that a declaratory judgment would be the better approach. Respondent told the Singletons that he would need a copy of their abstract. However, it was the Singletons' understanding that Respondent would examine the abstract, issue a title opinion, and prepare a document for Mr. Kifer's heirs to sign disclaiming any interest in the Singletons' property.

¶ 5 Two days later, Mrs. Singleton delivered a $750 check and the abstract to Debbie at Respondent's office. Debbie cashed the check. None of the money was deposited into a trust account.

¶ 6 Respondent testified that he drafted a petition, but he could not produce a copy of it. He testified that he searched his computer and could not find a draft of the petition. When the Singletons did not hear from Respondent, they called his office numerous times without him responding. Evidently, Debbie told Respondent that the Singletons had called and that they had resolved the problem. In April of 2001, the Singletons asked for a refund. On several occasions, Debbie told the Singletons that a refund check would be available but always made an excuse when it was not ready.

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another, . . .

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation, [or]

(d) engage in conduct that is prejudicial to the administration of justice.

15. Okla. Stat. tit. 5, ch. 1, app. 3–A (2001).

16. Rule 5.2 of the RGDP requires that a lawyer make a written response to a bar grievance or request for information containing "a full and fair disclosure of all the facts and circumstances pertaining to the respondent lawyer's alleged misconduct. . . ."

17. Rule 5.3 of the RGDP deals with the Commission's alternatives in dealing with grievances and appears to be a typographical error.

18. Okla. Stat. tit. 5, ch. 1, app. 1–A (2001).

19. In contrast to the testimony of both the Singletons, Respondent asserts that he had met with them one time before March 7, 2001, and that March 7, 2001, was the date of the second meeting. Debbie Sheridan remembers only one meeting Respondent had with the Singletons.

¶ 7 The Singletons asked for an accounting, but Respondent has not complied with the request and has not refunded any of the Singletons money. Respondent testified that he believed he was entitled to the fee because of the work he had done on the matter. However, he admits that he did not complete the task to which he agreed through no fault of the Singletons. He attributes the problems to Debbie and his failure to supervise her. Respondent admits that he should have consulted with the Singletons after Debbie told him that they had resolved the problem. All of Respondent's testimony regarding Debbie's misdeeds are supported by her testimony.

## C. COUNT II

¶ 8 The parties stipulated to the facts surrounding count II. In November of 2000, James Graham retained Respondent to handle the legal affairs associated with the death of Graham's wife. Graham paid Respondent $1,500 and delivered all the documents that Respondent needed. When Graham began calling the office, Debbie gave him a court date. On the day of the alleged court day, Debbie called Graham and told him that the hearing date had been cancelled and that she would notify him of a new date.

¶ 9 Three weeks later, Graham had not heard from Respondent or Debbie. When Graham's daughter called the office, Debbie gave her a new court date of April 25, 2001. On the morning of the court date, Debbie called and told Graham that a new date would have to be set because Respondent's father had been taken to the hospital. Later Debbie gave them another court date of June 17, 2001, but she called the same day telling Graham that Respondent had been in an accident and the hearing would have to be rescheduled.

¶ 10 On June 19, 2001, Graham sent a letter to Respondent terminating his representation. When Graham's daughter called the courthouse, she was told that no probate had been filed on Graham's wife. In his initial response, Respondent did not give a reason for taking the fee and not filing the probate. In Respondent's November 14, 2001, response, he stated that he believed a

refund was the best way to resolve the problem. Although he stated several times that he would refund Graham's payment, he did not do so until February 19, 2003, and the refund check was not from Respondent's operating account or trust account.

## D. COUNT III

¶ 11 Most of the facts of count III are stipulated. After Respondent finalized a divorce for Susan Kelley, she retained him to represent her in a post-divorce proceeding to compel her ex-husband to comply with the decree. Unbeknownst to Respondent, Debbie sent Kelley a letter and a contempt citation which Kelley signed and returned on December 5, 2000. Kelley also remitted a $30 filing fee for the citation. Although the $30 check was cashed, no contempt citation was filed.

## E. COUNT IV

¶ 12 The stipulated facts of count IV are as follows. On July 20, 2001, Michelle Woodruff sought Respondent's help in securing a waiver divorce. Within one week, Woodruff tendered the $750 flat fee. After Woodruff signed the petition on August 3, 2001, her husband signed the waiver. Debbie told them there was a 90–day waiting period before the divorce could be finalized. During the 90–day period, Woodruff asked to speak to Respondent on numerous occasions without success.

¶ 13 Debbie told Woodruff that Woodruff was scheduled to participate in a mandatory pre-divorce class on December 4, 2001. However, the night before the class was scheduled, without Respondent's knowledge, Debbie informed Woodruff that the class had been cancelled. Woodruff called the Wagoner County Court Clerk and learned that her divorce had never been filed.

¶ 14 On December 19, 2001, Woodruff sent Respondent a letter terminating his services and asked for a refund. On April 30, 2002, a default judgment was entered against Respondent and in favor of Woodruff. About a week thereafter, Respondent refunded Woodruff's payment. The refund check was not written on any of Respondent's accounts.

## F.  COUNT V

¶ 15 In May of 2001, Melissa and Link Estes hired Respondent to file a bankruptcy petition. They paid him $950 and completed and returned the forms on May 14, 2001. After several unsuccessful attempts to speak with Respondent, Debbie told them that a hearing was scheduled for July 13, 2001. On the day of the hearing, Debbie told the Esteses that the hearing had to be rescheduled. From May until December of 2001, the Esteses attempted to contact Respondent but were unsuccessful.

¶ 16 When creditors contacted the Esteses, they were told to contact Respondent. Finally, one of the creditors told the Esteses that no bankruptcy was filed. Mrs. Estes then confirmed that no bankruptcy petition had been filed. Using the petition that Respondent had prepared, Mrs. Estes filed the bankruptcy as a pro se. In his response to the grievance, Respondent acknowledged that had not filed the bankruptcy.

¶ 17 The Esteses filed a small claim action against Respondent for $4,500 for failing to carry out his obligation which resulted in them not receiving their income tax return overpayment. After default judgment was entered against Respondent, he contacted Mrs. Estes. Without advising her that she should seek the advice of independent counsel before settling, Respondent paid her $4,500 and obtained a release. Without Respondent's knowledge, Debbie had refunded the $950 fee with a cashier's check.

## G.  COUNT VI

¶ 18 On July 31, 2001, Dortha Olden hired Respondent to seek post-conviction relief for her son, David Olden. Ms. Olden paid Respondent a $500 fee and signed a medical release. She thought that her medical condition might be grounds for her son's early release from prison which would allow him to help care for her. Ms. Olden claims that she called Respondent's office several times thereafter but that he did not return her calls.

¶ 19 Ms. Olden claims that she never heard from Respondent again. Respondent testified and his records show that he reviewed David Olden's criminal file, that he concluded that there was no basis for review, and that he called Ms. Olden and informed her of his conclusion. Respondent did not follow up his conversation with a letter. Respondent has not refunded the $500 fee because he claims that he completed the work.

## H.  COUNT VII

¶ 20 On September 9, 2001, Dwayne Moore hired Respondent to represent him in a divorce proceeding. Moore paid Respondent $864. Respondent drafted the divorce petition which was not filed. Respondent claims that he did not know that the petition was not filed. Respondent failed to return Moore's calls because he did not receive the messages. In December of 2001, Moore was forced to retain another attorney to represent him. Respondent refunded the $864 with a check written on his father's account.

## I.  COUNT IX [20]

¶ 21 Respondent agrees that after his brother left the firm to work in the Muskogee District Attorney's Office, he used a letterhead which indicated the name of the firm was "Sheridan & Sheridan" and listed his brother as attorney in the firm. He also used the name "Sheridan & Sheridan" on pleadings filed on April 4, 2002.

## J.  COUNT X

¶ 22 In the Moore case, Debbie provided Moore with a false case number so that he could attend mandatory parenting classes. When he attempted to attend the classes, Moore was told that his divorce petition had not been filed and that he had been given a false case number.

¶ 23 Respondent represented Ruth Gallegos in a divorce proceeding. Debbie copied a file stamp from a document in an unrelated proceeding, placed the copied file stamp on Gallegos' unfiled petition, and presented the petition to Gallegos. When Gallegos at-

20.  Count VIII was dismissed.

tempted to attend parenting class, she was told that her case had not been filed.

## K. COUNTS XI AND XII

¶ 24 The stipulated facts contain an additional account which is not in the complaint. Stipulated counts XI and XII address Respondent's failure to properly respond to the OBA's request for information. On February 19, March 18, and April 8 of 2002, the OBA wrote to Respondent concerning three of the grievances. Respondent failed to respond. On April 16, 2002, the OBA issued a subpoena for Respondent's deposition. When the process server was unable to serve Respondent, the OBA's investigator contacted a judge before whom Respondent appeared. The judge in turn contacted Respondent. The same afternoon, the Respondent contacted the investigator and, the next day, drove to Oklahoma City to meet with the investigator.

¶ 25 At the meeting, Respondent gave the investigator his home address and telephone number. When Respondent requested that the OBA's communication be sent to his home address, the investigator informed him that he would have to officially change his roster address to that of his home. Respondent did not change his roster address. Respondent filed his response on May 1, 2002, and his deposition was taken on May 2, 2002.

¶ 26 On June 4, June 14, and July 5 of 2002, the OBA wrote Respondent asking for a response to grievances. Respondent did not respond. The OBA again issued a subpoena and took Respondent's deposition.

¶ 27 The testimony of the OBA's investigator and Respondent show additional facts concerning Respondent's failure to respond. Respondent testified that he believed Debbie received the OBA's requests for information that were sent to his office and did not give them to him. The investigator sent some letters to the home address which Respondent received, although he does not think that they were requests for information or copies of the complaints. Respondent did not respond to the letters sent to his home address. He admits that he did not change his roster address with the OBA after he learned that Debbie was intercepting and hiding his mail.

¶ 28 After he learned of the first set of grievances in October of 2001, Respondent talked with Debbie about her behavior. In November of 2001, Respondent hired a second person who would receive his mail, open it, and place it on his desk. Then in April of 2002 when Respondent learned of the second set of grievances, he says that he fired Debbie but that she had access to his office until October of 2002 because she was working in the same building. Debbie admits to intercepting Respondent's mail and phone calls while she was employed by him. However, she does not admit to taking things after she was terminated. She states that the reason for her actions was that she did not want Respondent to be upset with her.

## III. ANALYSIS

¶ 29 After a hearing, the PRT found that the OBA proved by clear and convincing evidence that Respondent had violated the ORPC and RGDP. However, the PRT found that the OBA had failed to adequately prove that Respondent had violated rules 1.2, 1.15, 3.2, 8.4(a) and (c),7.1 and 7.5(c) of the ORPC and rule 5.3 of the RGDP. The PRT recommended that Respondent be suspended for sixty days, that he refund the Singleton's $750 fee and the $30 Susan Kelley paid him, that Respondent pay the costs of the proceedings, and that Respondent participate in the Management Assistance Program offered by the OBA.

¶ 30 The PRT based on its recommendations on it findings: (1) Respondent had violated rules 1.1, 1.3, 1.4, 1.5, 1.8(h), 1.16, 5.3, and 8.4 of the ORPC and 5.2 of the RGDP; (2) the ethical violations were extensive; and (3) while Respondent's ethical violations were exacerbated by Debbie's behavior, they are attributable to Respondent's failure to act with diligence and communicate timely and effectively with his clients. For the most part, Respondent agrees with the PRT's findings. However, he believes that he needs to learn to manage his law office and should, at most, receive a thirty-day suspension.

¶ 31 After a de novo review, we find that Respondent has violated the ORPC and the RGDP. In Count V, the Respondent violated rule 1.1 of the ORPC because he should have known that failure to timely file Estes' bankruptcy petition would affect which assets would be a part of the bankruptcy estate. As the PRT stated, rule 1.3 which requires diligence is the rule which Respondent most blatantly violated. Even though the problems were exacerbated by Debbie's behavior, Respondent was the one who failed to fulfill his responsibilities to his clients by making certain that the cases were properly handled. If Respondent had been diligent, he would have discovered early that there were problems and could have taken action to prevent further problems. Respondent's lack of diligence also resulted in a violation rule 3.2 of the ORPC because he did not make reasonable efforts to expedite his clients' litigation.

¶ 32 In the first seven counts, Respondent violated rule 1.4 of the ORPC by failing to properly communicate with his clients. The comments to rule 1.4 are instructive concerning the need for open communication:

> A client's interests often can be adversely affected by the passage of time or the change of conditions.... Even when the client's interests are not affected in substance, however, unreasonable delay can cause a client needless anxiety and undermine confidence in the lawyer's trustworthiness.

It is clear from the number of unanswered telephone messages and the other evidence that Respondent's clients were anxious and at a minimum the Singletons' interests and Esteses' interests were irreparably compromised. If Respondent had initiated any follow-up calls to one of these clients, he would have realized that he was not receiving his messages before the OBA became involved.

33 Respondent charged the Singleton's $750 to represent them. Respondent says that he went to the property, did an title examination, and drafted a petition. However, he could produce no tangible evidence of any work. Although it is disputed whether Respondent was to file a pleading or write a letter, he did neither. In either case, Respondent did not complete his agreement with the Singletons, and the Singletons received no benefit from any work Respondent may have done. They justifiably dismissed Respondent who, until this disciplinary matter, has refused to return the retainer. Although he now agrees to refund the retainer, he has yet to do so. The $750 fee was unreasonable in violation of rule 1.5 of the ORPC.

¶ 34 The PRT found that there was no evidence that Respondent violated rule 1.15 of the ORPC. We disagree. Rule 1.15(a) requires a lawyer to hold clients' property separate from the lawyer's property. Because an advance fee retainer remains the client's property until it is earned, it must be segregated.[21] By his own admission, Respondent did not deposit the retainers into his trust fund and apply them when the fees were earned. Rather, he deposited the money in his operating account. Refunds of the fees to clients involved in this disciplinary matter were not made from a trust fund but paid by Respondent's father.

¶ 35 Rules 1.16 and 1.15(b), not only requires a lawyer to refund advance fees not earned but to do so in a timely manner. Michelle Woodruff was not paid until she obtained a judgment against Respondent. Graham was not repaid until almost one and one-half years after Responded was terminated. Moore was not repaid for over a year after terminating Respondent. Further, Respondent has not repaid the $30 Kelley paid him for the cost of filing the contempt citation which was never filed. While not a fee under rule 1.16, the payment should have been refunded. As yet, Respondent has not refunded any of the Singleton's $750.

¶ 36 Respondent admits he violated rules 1.8(h) of the ORPC by failing to advise Ms. Estes to seek independent counsel before settling her claim against him. He also admits to violating rule 5.3 by failing to properly supervise Debbie.[22] By violating the rules

21. *State ex rel. Oklahoma Bar Ass'n v. Bills,* 1997 OK 151, ¶ 8, 951 P.2d 1090.

22. *State ex rel. Oklahoma Bar Association v. Taylor,* 2000 OK 35, ¶ 19, 4 P.3d 1242, 1251; *State*

previously discussed, Respondent has violated rule 8.4. Respondent has also admitted to failing to timely and fully respond to the OBA grievance notifications and requests for information.

■ ¶ 37 The PRT found that Respondent had not violated rule 7.5 by using the letterhead "Sheridan and Sheridan" and listing his brother, an assistant district attorney as a member of the firm. The PRT reasoned that Respondent did not intend to deceive anyone and that the brother was not an elected official. Rule 7.5(c) prohibits the use of "[t]he name of a lawyer holding a public office ... in the name of a law firm ... in which the lawyer is not actively and regularly practicing with the firm."

■ ¶ 38 A public office is defined by its characteristics.[23] A public officer is required by law to be elected or appointed, has a legal designation or title, and exercises governmental functions assigned by the law.[24] In *Grand Jury of McCurtain County v. Cecil,*[25] the Court of Civil Appeals addressed the question of whether an assistant district attorney was a public officer. We agree with the Court of Civil Appeals' reasoning, as did the Oklahoma Court of Criminal Appeals in *Battiest v. State,*[26] that an assistant district attorney is not a public officer because the duties are defined by the district attorney and can be changed at the will of the district attorney.

■ ¶ 39 Even though we find that Respondent did not violate rule 7.5(c), he did violate rule 7.5(d) which prohibits lawyers from stating that they practice in a partnership unless it is the fact. Respondent's letterhead stated that he was in a partnership with his brother when in fact the brother was no longer part of the firm. Intent to deceive in not an element of the violation. There-fore, Respondent violated rule 7.5(d) by failing to remove the misleading information from his letterhead, another example of Respondent's lack of diligence.

■ ¶ 40 As to the Olden matter, the PRT found that Respondent had failed to properly communicate with his client. Respondent agrees with this finding. The PRT also found that the OBA had not sufficiently proven that Respondent had violated rule 3.2 by failing to expedite the litigation. We agree. The evidence is not clear and convincing that Respondent failed to expedite the litigation by conducting a review of David Olden's criminal file and Ms. Olden's medical records. The evidence showed that Respondent conducted a review of the documents and concluded there was no basis for post-conviction relief.

## MITIGATION

■ ¶ 41 Respondent submits two factors in mitigation of discipline. The first is Debbie's role in creating the problems. While we agree that Debbie's behavior exacerbated Respondent's problems, the problems are attributable to Respondent's lack of diligence and neglect of his responsibilities. Upon learning of Debbie's failing to give him his messages and intercepting his mail, Respondent took inadequate measures to rectify the problems. However, Respondent's inaction did not rise to the level of ratification of Debbie's behavior.[27] Further, he did not take the steps necessary to assure that he received his correspondence from the OBA. He did not change his roster address, and he moved without giving the OBA his new address. While Debbie's behavior exacerbated the problems, Respondent was responsible for supervising Debbie and failed to do so in violation of rule 5.3.[28]

*ex rel. Oklahoma Bar Ass'n v. Mayes,* 1999 OK 9, ¶ 25, 977 P.2d 1073, 1082.

23. *See State v. Evans,* 1957 OK 304, ¶ 12, 319 P.2d 1112, 1116–17.

24. *Id.*

25. 1983 OK CIV APP 47, 679 P.2d 1308.

26. 1988 OK CR 95, ¶ 3, 755 P.2d 688, 689.

27. The OBA suggests that Respondent violated rule 8.4(a) by ratifying Debbie's behavior. Likewise, we agree with the PRT that the OBA has not proved by clear and convincing evidence that Respondent violated rule 8.4(c) or 1.2 of the ORPC.

28. *Taylor,* 2000 OK 35, ¶ 19, 4 P.3d 1242, 1251; *Mayes,* 1999 OK 9, ¶ 25, 977 P.2d 1073, 1082.

¶ 42 Respondent pled clinical depression as a mitigating factor. He failed to present any evidence to support this claim. Further, rule 1.16(a)(2) of the ORPC requires a lawyer to decline representation if "the lawyer's physical or mental condition materially impairs the lawyers' ability to represent the client...."

## DISCIPLINE

¶ 43 The PRT recommended that Respondent be suspended for sixty days, refund the $750 fee to the Singletons, refund the $30 paid by Susan Kelley, pay the costs of the proceeding, and participate in the OBA's Management Assistance Program. The OBA advocates that the suspension should be for one year, and Respondent suggests thirty days as the appropriate suspension.

¶ 44 Respondent's primary fault is neglect and a lack of diligence in supervising his employee, in communicating with his clients, in following through with his responsibilities to his clients, in handling his clients' money, in removing his brother's name from the firm stationary, in refunding unearned fees, and in communicating with the OBA. This Court has imposed discipline for neglect of clients' matters ranging from a public censure to a two-year and one-day suspension.[29]

¶ 45 In *State ex rel. Oklahoma Bar Ass'n v. Wilkins*,[30] this Court imposed a six-month suspension for failing to keep clients reasonably informed, for commingling and simple conversion of clients' funds, for failing to be honest with a client about using settlement funds to off-set a prior bill, and for failing to respond to the OBA's request for information. This Court imposed a six-month suspension in *State ex rel. Oklahoma Bar Ass'n v. Williams*,[31] for commingling and simple conversion of client funds and for a conflict of interest. The attorney had been previously disciplined. Again the Court imposed a six-month suspension in *State ex rel. Oklahoma Bar Ass'n v. Mayes*[32] for commingling and simple conversion of his client's funds, for being seriously deficient in managing his practice with respect to supervising non-lawyer employees, and for failing to adequately communicate with his clients.

¶ 46 Given the goals of discipline to protect the public, to protect the courts, to preserve the integrity of the bar, and to deter misconduct by both the lawyer being disciplined and other members of the bar, we believe the appropriate discipline is suspension from the practice of law for six months. Respondent has also agreed to refund the Singletons' $750 retainer and the Kelley's $30 filing fee, to pay the costs of these proceedings, and to participate with the OBA's Management Assistance Program.

## CONCLUSION

¶ 47 Respondent, John H.T. Sheridan, is suspended from the practice of law for six months. He is ordered to refund $750 to the Singletons and $30 to Susan Kelley within thirty days of the date this Court's opinion becomes final. Respondent is also ordered to paid $3,844.68 for the cost of these proceedings within 180 days of the date this Court's opinion becomes final. Further, Respondent is ordered to participate in the OBA's Management Assistance Program for as long as the program's director deems necessary.

RESPONDENT'S LICENSE TO PRACTICE LAW IS SUSPENDED FOR SIX MONTHS; RESPONDENT IS ORDERED TO PAY COSTS OF THESE PROCEEDINGS AND TO REFUND PAYMENTS TO CLIENTS; RESPONDENT IS ORDERED TO PARTICIPATE IN THE OKLAHOMA BAR ASSOCIATION'S MANAGEMENT ASSISTANCE PROGRAM.

¶ 48 WATT, C.J., OPALA, V.C.J., LAVENDER, SUMMERS, BOUDREAU, WINCHESTER, JJ., concur.

¶ 49 HARGRAVE, KAUGER, JJ., concur in result.

---

**29.** *State ex rel. Oklahoma Bar Ass'n v. Benefield*, 2002 OK 37, ¶ 14, 51 P.3d 1198, 1200–01.

**30.** 1995 OK 59, 898 P.2d 147.

**31.** 1995 OK 130, 911 P.2d 905.

**32.** 1999 OK 9, 977 P.2d 1073.