OSCN Found Document:STATE ex rel. OKLAHOMA BAR ASSOCIATION v. WEIGEL

 
 
 
 OSCN navigation


 
 Home

 
 Courts

 
 Court Dockets

 
 Legal Research

 
 Calendar

 
 Help
 





 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 

 
 
 
 STATE ex rel. OKLAHOMA BAR ASSOCIATION v. WEIGEL
2014 OK 4
321 P.3d 168
Case Number: SCBD-5864
Decided: 02/04/2014
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2014 OK 4, 321 P.3d 168

STATE OF OKLAHOMA ex rel. OKLAHOMA BAR ASSOCIATION, 
Complainant,
v.
JOHN HOLMAN WEIGEL, Respondent.

ATTORNEY DISCIPLINARY PROCEEDING

¶0 The Oklahoma Bar Association filed a Rule 6 proceeding against the 
Respondent, John Holman Weigel, alleging violations of the Oklahoma Rules of 
Professional Conduct and the Rules Governing Disciplinary Proceedings. A 
formal hearing was held before a trial panel of the Professional Responsibility 
Tribunal, which recommended to the Court that Respondent be suspended from the 
practice of law for six (6) months. The Complainant recommended suspension for 
two years and one day. Having reviewed the matter de novo, we suspend the 
Respondent from the practice of law for two years.

RESPONDENT SUSPENDED FOR TWO YEARS AND
ORDERED TO 
PAY COSTS.

Loraine Dillinder Farabow, First Assistant General Counsel, OKLAHOMA BAR 
ASSOCIATION, Oklahoma City, Oklahoma, for the Complainant.
Jack S. 
Dawson, MILLER DOLLARHIDE, P.C., Oklahoma City, Oklahoma, for the 
Respondent.


EDMONDSON, J.
¶1 The Oklahoma Bar Association (Bar) filed on August 21, 2012, an amended 
formal complaint pursuant to Rule 6.1, Rules Governing Disciplinary Proceedings 
(RGDP), 5 O.S. 2011, ch. 1, app. 1-A, against John Holman Weigel (Respondent), 
alleging six (6) counts of professional misconduct in violation of the Oklahoma 
Rules of Professional Conduct, 5 O.S. 2011, Ch. 1, app. 3-A, (ORPC) and the 
RGDP. The parties filed Joint Stipulations, but the Respondent denies the 
stipulated conduct violated any rules of professional conduct or disciplinary 
procedure and contends professional discipline is not warranted. The allegations 
set out below are taken from the stipulated facts.
COUNT I - The Boyd Grievance
¶2 The Bar received a grievance from Peggy Jean Boyd on October 26, 2009, 
regarding the Respondent's representation of her son, Roger D. Boyd. The Bar 
opened Boyd's grievance for informal investigation and by letter dated November 
3, 2009, advised the Respondent of the grievance and requested a response in 
writing within two weeks. No response was received and the Bar on November 25, 
2009, mailed another letter to the Respondent at his official roster address, 
advising him of his failure to respond to the Boyd grievance and requesting that 
he do so within five (5) working days from the date of the letter. The 
Respondent did not respond. By letter of December 23, 2009, the Bar advised it 
was opening Boyd's grievance for formal investigation and informed the 
Respondent he was required to respond in writing within twenty (20) days. He 
responded by letter dated January 8, 2010, and apologized for the delay in his 
initial response. The Bar alleged violation of Rule 8.1(b) of the ORPC and Rules 
1.3 and 5.2 of the RGDP for failure to respond to the Boyd grievance.
COUNT II - The Whiteley Grievance
¶3 On July 8, 2009, Cody Alan Whiteley hired the Respondent to represent him 
in a paternity action pending in Jackson County, Oklahoma. The contract provided 
that Whiteley would pay a "flat fee" of $12, 000.00, with $6,000.00 due 
immediately, then payments of $1,000.00 per month until paid in full. The 
Respondent did not have a trust account. At Respondent's specific request, 
Whiteley's mother wired $6,000.00 to the Respondent's account with the First 
State Bank of Altus on July 8, 2009, and then wrote the Respondent a check for 
$1,000.00 on August 12, 2009, which was deposited into the same account. After 
the $6,000.00 deposit, the Respondent made numerous disbursements of funds from 
the general account for personal and business expenses.
¶4 On August 27, 2009, the Respondent met with Cody Whiteley in Texas after 
Whiteley's mother threatened to stop making any further payments and sought to 
remove herself as Cody's guarantor. The Respondent admits meeting with Whitely 
but denies it was under threat. The Whiteleys left numerous telephone messages 
and sent repeated emails expressing their concern that no action had been taken. 
The Respondent failed to timely respond to their repeated requests about the 
status of the case. By certified mail dated November 3, 2009, the Whiteleys 
terminated the Respondent and requested a refund and return of Cody's file. The 
Respondent did not claim the certified mailing and did not respond to the 
Whiteleys' request. The Respondent did not provide the Whiteleys with an 
accounting and he denies that a refund was requested. On November 26, 2009, Cody 
Whiteley filed a grievance with the Bar alleging neglect of his legal matter and 
failure to earn the $7,000.00 paid.
¶5 The Bar alleged violations of Rules 1.1, 1.3, 1.4, 1.5, 1.15, 1.16(d) and 
3.2 of the ORPC and Rule 1.3 of the RGDP, asserting the Respondent accepted a 
flat fee from the client, which he deposited in his operating account, and then 
failed to properly communicate with the client or to complete the work necessary 
to earn the fee. The Respondent claimed Whiteley was a difficult client who was 
hard to communicate with. After the Bar requested him to provide an accounting 
of the work performed on Whiteley's behalf and a copy of all work product, 
Weigel responded, by letter from his attorney, asserting the contract was for a 
flat fee and he earned the entire fee. He admitted he did not have a trust 
account, but argued he was not required to maintain one because the fee was 
earned when paid.
COUNT III - The DeLeon Grievance
¶6 Tomas DeLeon, III, was convicted on August 19, 2003, in Stephens County 
District Court, of five counts of lewd molestation. He was sentenced to serve 
sixteen years imprisonment and his conviction was affirmed on state and federal 
appeals. DeLeon's mother spoke with the Respondent on January 28, 2010, to see 
whether anything further could be done in her son's case. The Respondent assured 
her he could help, even if it meant getting a pardon, and the fee would be 
$5,000.00. Mrs. DeLeon wired $1,000.00 to Respondent's general account. On 
February 17, 2010, DeLeon's parents drove from Texas to meet with the Respondent 
in Altus, at which time he stated three options were available: to seek a 
pardon, to seek a commutation of the sentence, or to seek a modification of the 
sentence. He advised them it would take six or eight weeks for him to seek the 
desired result. The Respondent denies he assured them a result.
¶7 The DeLeons would testify they paid the Respondent an additional 
$4,000.000 by cashier's check, executed a contract with him and turned over 
their son's legal papers to him. The contract provided for a flat fee of 
$5,000.00 for the Respondent to represent, appear and act for his client on all 
currently available administrative and executive remedies relating to his 
conviction in CF-03-149 in Stephens County, Oklahoma. It provided that all fees 
were nonrefundable due to time constraints on the attorney and the complexity of 
the case, but no further fees would be required under the contract. The 
Respondent told the DeLeons he would notify the prison of his representation and 
he would call and speak to Tomas. He would either take the necessary documents 
to the prison or mail them for Tomas to execute. From February 17, 2010, until 
May 12, 2010, the Respondent did not communicate with Tomas or with the DeLeons. 
On May 12, 2012, the Respondent answered the phone and told Mrs. DeLeon he would 
call her the next day at 5:00 p.m. He did not call and Mrs. DeLeon repeatedly 
left messages requesting that he contact her.
¶8 On May 26, 2010, Mrs. DeLeon called from a different phone number and the 
Respondent answered, but told her to call the next day to make an appointment. 
The next day, Mrs. DeLeon telephoned the Respondent approximately nine times 
without getting an answer. On June 9 the DeLeons drove to Respondent's 
home/office in Altus and repeatedly rang the doorbell, but the Respondent did 
not answer. They called from a nearby payphone and when the Respondent answered 
he said he had just come home. When she said his car was parked in the driveway 
when they came by, he said he had been asleep. They drove back to his home and 
talked to him outside, asking to see the work he had done. The Respondent told 
them he would have everything done by June 12, 2010, and arranged to meet with 
them at 10:00 a.m. that day at his home to show them the paperwork.
¶9 On June 12, he gave the DeLeons a one and one-half page letter addressed 
to "Dear ______," with no name or address listed. This was purportedly an 
"Application for Commutation/Parole Consideration of Tomas DeLeon, III." He told 
them that he had done all he could for their son and demanded they sign a paper 
releasing him from all obligations. They refused and asked for a copy of the 
release, but the Respondent refused to give them a copy if they weren't going to 
sign it. He told them he would have their son's paperwork completed by June 14, 
2010, and would mail it to them. Mrs. DeLeon did not receive any paperwork and 
when she contacted the Respondent he said he had mailed it. He said he would put 
another copy in the mail and he then hung up on her. Mrs. DeLeon immediately 
called back and advised the Respondent they no longer wanted his services. She 
requested return of her son's legal documents and a refund of their money. The 
Respondent again hung up on her.
¶10 On June 22, 2010, the Respondent gave them the same letter, with a few 
extra lines added. He did not return the files or make any refund. On July 6, 
2010, the DeLeons filed a grievance and the Bar advised the Respondent of the 
investigation. On August 2, 2010, the DeLeons went to the Respondent's home to 
pick up their sons's legal documents. He refused to give them the files unless 
they signed a "Receipt and Acknowledgment." They refused to sign and the 
Respondent then presented them with a "Statement of Services Rendered" which 
reflected they owed him an additional $812.50, although he said he was not going 
to ask them to pay it. The DeLeons would testify the Respondent gave them a 
large box containing their son's records which appeared to have cat feces and 
urine on them.
¶11 In his response to the Bar dated August 9, 2010, the Respondent stated he 
had explained to the DeLeons at the outset that the chances for relief were 
remote because the case had been through state and federal appeals for nearly 
seven years and the file was voluminous. He states the DeLeons decided to hire 
him on February 17, 2010, with the specific provision that all fees would be on 
a flat flee basis and were nonrefundable. The response enclosed a "Statement of 
Services Rendered" which stated that he spent 25.25 hours on the case at a rate 
of $250.00 per hour.
¶12 The DeLeons sued the Respondent in Jackson County District Court, and on 
August 25, 2010, the court ordered the Respondent to pay them $2,301.75 in 
restitution and court costs. Respondent gave them a cashier's check for that 
amount as a settlement of the matter. The Bar alleged violations of Rules 1.1, 
1.3, 1.4, 1.5, 1.15, 1.16(d) and 3.2 of the ORPC and Rule 1.3 of the RGDP, 
asserting the Respondent accepted a flat fee from the client and deposited the 
fee in his operating account, failed to properly communicate with the client and 
failed to competently complete the work necessary to earn the fee. The 
Respondent admitted he accepted a flat fee but he claimed the fee was earned at 
the time of payment.
COUNT IV - The Owens Grievance
¶13 In Count IV, the Bar alleged the Respondent violated Rules 1.1, 1.3, 1.4, 
3.2, 8.4(d) of the ORPC and Rule 1.13 of the RGDP, by accepting a flat fee from 
the client, then failing to properly communicate with the client or to 
diligently and properly complete the work for which he had been paid. On April 
13, 2010, Michael Owens hired the Respondent to represent him in Case No. 
FD-2001-32, a custody and child support modification matter in the District 
Court of Jackson County. Owens paid the Respondent $1,900.00 between April 13 
and June 15, 2010. The Respondent filed a motion to modify the decree of divorce 
and an application for an emergency ex parte custody order. A temporary 
order granted custody to Owens and set the matter for hearing on August 24, 
2010. On September, 13, 2010, the court ordered child support in Owens' favor 
and directed opposing counsel, Talley, to prepare the order. Talley requested 
necessary information concerning Owens' income, but the Respondent never 
provided the documents. As a result, Owens was required to continue to pay child 
support under the former court order. Owens stated the Respondent advised him to 
stop paying child support since the child was living with him and stated he 
would contact the Texas Department of Human Services to let them know that a new 
order was being prepared. Owens stopped paying and the State of Texas began to 
garnish his wages in the amount of the original child support, plus an 
additional $50.00 per month because of an arrearage of $750.00 When contacted, 
the Respondent made excuses and blamed opposing counsel for causing the delay in 
filing the order.
¶14 Owens filed a grievance against the Respondent on January 24, 2011, 
alleging neglect and lack of diligence getting the order filed. The Respondent 
blamed Owens and Talley for the delay. He stated he had sent the information to 
Talley but it was not received, so he was required to obtain updated information 
from Owens. Wilma Owens responded she had promptly faxed the financial 
documentation to the Respondent on at least three (3) occasions. She contacted 
the State of Texas and was advised there was no documentation that the 
Respondent had ever notified them of the temporary order. The Respondent advised 
he would file a Motion to Settle Journal Entry and forward a copy to the Bar. He 
did not do so and continued to blame Talley. He advised the Bar that he had 
contacted the Texas child support authorities on several occasions on Owens' 
behalf.
COUNT V - The Lara Grievance
¶15 In Count V, the Bar alleged Respondent's conduct violated Rules 1.1, 1.3, 
1.4, 1.5, 1.15, 1.16(d), 3.2 and 8.4(d) of the ORPC and Rule 1.3 of the RGDP by 
accepting a flat fee from the client, depositing the fee into his operating 
account and then failing to properly communicate with the client or to 
competently complete the work necessary to earn the fee. Jose Lara hired the 
Respondent in May of 2011 to represent him in a custody and child support 
modification in Harmon County, Oklahoma. He paid the Respondent a total of 
$2,300.00, which the Respondent deposited into his general account. The 
Respondent attended an initial child support hearing on November 14, 2011, but 
never filed any pleadings in either matter and failed to communicate with Lara 
as to the status of his legal matters. Lara was the Respondent's neighbor and 
made several attempts by telephone and visiting Respondent's home unannounced in 
an effort to discover the status of his case.
¶16 In early 2012, the Respondent moved to Texas and ceased communications 
with Lara. On May 16, 2012, Lara filed a grievance against the Respondent, 
alleging neglect of his legal matters, failure to return his file and failure to 
return his fee so that he could hire another attorney. In his response to the 
Bar, the Respondent advised he had the custody matter prepared and ready to file 
and that he scheduled a meeting with Lara for June 11, 2012. At that meeting, 
Lara terminated representation by the Respondent and requested a return of his 
file and unearned fees. The Respondent provided Lara with a check for $1,300.00. 
The Respondent filed a response with the Bar on June 28, 2012, in which he 
enclosed a copy of part of Lara's file and an accounting in which he estimated 
he had performed $3,260.00 in legal services for Lara. He included a photocopy 
of the refund to Lara, and stated he would regard the $2,260.00 balance due as 
waived for client goodwill.
COUNT VI - the Williams Grievance
¶17 In Count VI, the Bar alleged conduct in violation of Rules 1.1, 1.3, 1.4, 
1.5, 1.15, 1.16(d), 3.2 and 8.4(d) of the ORPC and Rule 1.3 of the RGDP by 
accepting a flat fee from the client, depositing the fee into his operating 
account and then failing to properly communicate with the client or to 
competently complete the work necessary to earn the fee. Priscilla Williams was 
incarcerated when her husband filed for divorce and custody of their minor 
child. A decree of dissolution of marriage was filed in Harmon County District 
Court Case No. FD-2010-11. In November 2010, she hired the Respondent for a flat 
fee of $2,500.00, which was paid by her mother. The parties reconciled shortly 
thereafter and Williams attempted to contact the Respondent on numerous 
occasions to tell him his services were no longer needed. Finally, Williams left 
a message terminating his services and requesting a refund. The Respondent did 
not communicate with her and he did not refund the fee. The parties had their 
divorce decree vacated on January 5, 2011, and Williams continued to leave 
messages with the Respondent to contact her and refund her fee. In late 2011, 
Williams left a message telling the Respondent she was going to file a grievance 
with the OBA. The Respondent returned her call and asked to meet to discuss the 
matter. At the meeting, the Respondent asked Williams to sign a document waiving 
any legal claim against him and agreeing not to contact the OBA. Williams 
refused to sign the paper and the Respondent told her he would keep her money in 
the event she needed legal services in the future.
¶18 Williams was again incarcerated in February 2012 and her husband sued her 
for divorce on April 19, 2012. She contacted the Respondent to represent her. He 
said he would and asked her to e-mail details of the issues presented. Williams 
e-mailed the requested information and then again responded to five more 
questions asked by the Respondent. He stopped communicating with her and on May 
28, 2012, Williams blocked her telephone number and phoned the Respondent. The 
Respondent answered and advised that he would represent her only if she agreed 
to an uncontested divorce on the terms offered by the husband's attorney. She 
refused and demanded a refund. He said he would give only a partial refund, if 
any. Williams appeared pro se at trial in her divorce on July 31, 2012, at which 
time she lost custody of her child. Opposing counsel advised the Bar the 
Respondent never contacted him on behalf of Mrs. Williams. The Respondent did 
not provide an accounting or a refund of the $2,500.00 to Williams or her 
mother.
¶19 These matters were presented to the Professional Responsibility Tribunal 
(PRT) on November 2, 2012, November 20, 2012, and February 28, 2013, the 
Respondent appearing in person and by his attorney of record. Ultimately, the 
PRT found the Bar established by clear and convincing evidence the Respondent 
committed specific acts constituting professional misconduct in violation of 
Rules 1.1, 1.3, 1.4, 1.5, 1.15, 1.16(d), 3.2, 8.1 and 8.4(d) of the ORPC,[1] and Rules 1.3 
and 5.2 of the RGDP.[2] It now recommends the Respondent be suspended from 
the practice of law for six months. The Bar argues the appropriate discipline is 
suspension for two years and one day, which would be tantamount to disbarment 
and would require the Respondent to apply for reinstatement of his license to 
practice law. The Respondent says his conduct warrants nothing more severe than 
a reprimand.
STANDARD OF REVIEW
¶20 In bar disciplinary proceedings, this Court exercises exclusive original 
jurisdiction as a licensing court, not as a reviewing tribunal. State ex rel. 
Oklahoma Bar Ass'n v. Berger,2008 OK 91 ¶12, 202 P.3d 822. It is our 
responsibility to examine the record and assess the credibility and weight of 
the evidence in order to determine whether it clearly and convincingly 
establishes professional misconduct by the attorney and, if so, what the 
appropriate discipline, if any, should be. State ex rel. Oklahoma Bar Ass'n 
v. Stutsman, 1999 OK 62, 
990 P.2d 854, 858. Our 
review is de novo and we are not bound by the recommendations of the PRT. 
State ex rel. Oklahoma Bar Ass'n v. Todd, 1992 OK 81, 833 P.2d 260, 261.
¶21 As for failure to respond to the Bar's requests for information, the 
Respondent argues the rules do not require a response to an informal complaint 
from the Bar within two weeks. We have held that a lawyer's obligation to 
respond to an OBA grievance is mandatory and failure to respond is a violation 
of the RGDP which forms a basis for discipline. State ex rel. Okla. Bar Ass'n 
v. Stow, 1998 OK 105, ¶12, 
975 P.2d 869; State ex 
rel. Okla. Bar Ass'n v. Spadafora, 1998 OK 28, ¶ 32, 957 P.2d 114, 119. The Bar 
established by clear and convincing evidence that the Respondent failed to 
respond to the grievance filed in the Boyd matter until a formal proceeding was 
instigated.
¶22 The Respondent maintains his fees were earned in each instance. He says 
he spent many hours meeting with clients and reviewing their files and that he 
also traveled to meet with certain clients. He says he expended time on each 
client's legal matter and his fees were reasonable. He argues that he was not 
required to maintain a trust account because the fixed fees he charged were 
earned upon receipt and thus could not be deposited in a trust account. He 
relies upon OBA Ethics Opinion No. 317, adopted December 13, 2002, for support. 
That opinion addressed availability fees, fixed fees and hourly fees designated 
as a nonrefundable retainer. The use of the term "nonrefundable retainer" to 
represent an advance payment of fees for hours of legal services that the 
attorney will perform in the future is impermissible. Such fees may be 
designated as fixed fees, but cannot impair a client's rights under Rule 
1.16(d). The fees are not "nonrefundable" because if the attorney withdraws or 
is terminated before completing the work, the attorney must refund the unearned 
portion of the advance.[3]
¶23 In McQueen, Rains & Tresch, LLP v. CITGO Pet. Corp., 2008 OK 66, 195 P.3d 35, we discussed 
nonrefundable retainer fees and related provisions in attorney/client contracts 
that have been upheld in other jurisdictions. The common factors were: the fees 
set out were reasonable; the contract was negotiated with a sophisticated client 
and the retainer agreement contained an agreement by the client to compensate 
the lawyer if the client terminates the relationship; the contract is in writing 
with a clear statement of the consequences of the provisions; where the 
attorney, in entering the contract, has changed positions or incurred expenses 
to meet the needs of the client or where the client's desire to have a 
particular attorney as a representative necessitates an immediate commitment at 
the risk to the attorney of forgoing or losing other potential business. Id. 
Contracts between attorneys and their clients regarding compensation stand 
on the same footing as any other contract and are upheld unless contrary to law, 
oppressive, fraudulent or the fee is obviously disproportionate to the services 
rendered. Rule 1.5 prohibits an attorney from making an agreement for an 
unreasonable fee. Comment 4 to Rule 1.5 states that a demand for advance payment 
may be made by the lawyer, but that any unearned portion of the collected fee 
must be returned.
¶24 The Respondent had fee contracts in the Whiteley and DeLeon matters The 
Whiteley contract provided that the Respondent would be paid $12,000.00 as a 
retainer, with payments of $1,000.00 per month to be paid after an initial 
payment of $6000.000. The Whiteleys paid the Respondent $7,000.00. The contract 
did not provide for a nonrefundable fee nor did it state that the fees were 
deemed earned upon receipt. The Respondent did not file any pleadings or other 
paperwork with regard to the case, not even an entry of appearance. His 
testimony was that "it was in the planning stages." The Respondent did not keep 
contemporaneous records, nor did he make written notes of contact with his 
client. There is no documentary evidence to support the Respondent's testimony 
that he was waiting on the client for further instruction, or that the client 
had agreed all pleadings would be filed simultaneously. The testimony reflects 
otherwise. The Respondent did not provide an accounting and he did not refund 
any of the $7,000.00 paid him. When the Bar requested an accounting, the 
Respondent produced, after several months, one he had created from memory.
¶25 The DeLeon contract provided for a nonrefundable flat fee. The Respondent 
believes he earned his $5,000.00 fee although he admits only one hour of the 
23.25 hours billed was spent drafting a cover letter to the Oklahoma Pardon 
Board (sic) members. From February 17 to May 12, there were no communications 
with the clients. Twelve of the 23.25 hours were spent reviewing the extensive 
file and creating a compilation of it. The DeLeons obtained a small claims 
judgment against him in the amount of $2,301.75, which he agreed to pay in 
settlement.
¶26 The Bar proved by clear and convincing evidence the Respondent took fees 
from clients and did not complete the work for which he was hired. A violation 
of Rule 1.15(a) is established by the Respondent's failure to hold his clients' 
property separate from his own property. An advance fee retainer requires that 
the property of the client must be segregated until it is earned. State ex 
rel. Okla. Bar Ass'n v. Sheridan, 2003 OK 80, 84 P.3d 710, 717. The 
Respondent deposited client funds in his operating account, in violation of Rule 
1.15. The Respondent's bank records reflect that after he deposited the client 
funds, cash withdrawals were made and checks were drawn on the account almost 
immediately for personal items. The Respondent failed to account for or return 
fees upon demand by clients. He failed to provide adequate representation and to 
act with reasonable diligence in representing his clients. He failed to keep the 
clients reasonably informed and he failed to promptly comply with reasonable 
requests for information from them. The Respondent's conduct violates Rules 1.1, 
1.3, 1.4, 1.5, 1.15, 1.16(d), 3.2, 8.1 and 8.4(d), ORPC and Rules 1.3 and 5.2 
RGDP.
¶27 Violation of the Oklahoma Rules of Professional Conduct and Rules 
Governing Disciplinary Procedure warrants the imposition of professional 
discipline. It is the duty of this Court to determine the appropriate level of 
discipline to be imposed, based on the facts and circumstances of the case. In 
determining the appropriate discipline, we look to the level of discipline 
imposed in other cases. The amount of discipline imposed has depended upon the 
unique factors in each case. Misuse of trust funds has resulted in the most 
severe discipline of disbarment.[4]
¶28 In State ex rel. Okla. Bar Ass'n v. Perkins, 1988 OK 65, 765 P.2d 825, 
failure to promptly repay client funds upon request, coupled with other misuses 
of client fund, mitigating circumstances absent, resulted in disbarment. 
A failure to account for or deliver money to the client upon demand may 
constitute a conversion. Funds belonging partly to a client and in part to the 
lawyer must be deposited in the lawyer's trust account. The portion belonging to 
the lawyer may be withdrawn when due unless the right of the lawyer to receive 
it is disputed by the client, in which event the disputed portion shall not be 
withdrawn until the dispute is finally resolved. Id. Mr. Weigel, in the 
present matter, did not maintain a trust account until the Bar advised him that 
he was required to have one. Client funds were deposited in his general account 
because he believed those fees to be earned when paid.
¶29 In State ex rel. Okla. Bar Assn's v. Schraeder, 2002 OK 51, 51 P.3d 570, a thirty-day 
suspension was deemed appropriate for the attorney's failure to promptly respond 
to the Bar's investigative inquiries, lack of concern for clients' economic 
interests as evidenced by refusing to promptly account for and restore unearned 
portions of fees for almost three years and disregard of his client's right to 
know status of case. Schraeder insisted that he filed no briefs or 
pleadings because he was waiting to receive pertinent information from the 
client's family in order to proceed with his criminal appeal. He did not respond 
to a letter requesting a detailed accounting and a refund of the unearned 
portion of the $2,800.00 fee because he believed that he had earned the fee by 
researching the various issues in the appeal, speaking to members of the 
client's family on several occasions and traveling twice to visit his client at 
the Adult Detention Center in Tulsa. Schraeder admitted that his conduct 
violated Rules 1.4, 1.5, 1.15(b), 1.16(b)(2) and (d), Rule 8.4(a) ORPC 
and Rule 1.3 RGDP. Schraeder offered in mitigation that he had not been 
previously disciplined and that he suffered from "burnout syndrome." We noted 
that his actions caused no grave economic harm. Schraeder acknowledged and 
accepted responsibility for his professional derelictions and, although his 
responses were dilatory during the initial investigative stages, they were 
characterized by candor and cooperation during the latter stages and in the PRT 
proceedings. We took the mitigating factors into account in fashioning the 
appropriate measure of discipline at suspension for thirty (30) days.
¶30 In State ex rel. Okla. Bar Ass'n v. Sheridan, 2003 OK 80, 84 P.3d 710, the attorney 
was suspended for six months for violations similar to those alleged against the 
Respondent. Sheridan deposited the client's money in his operating account. Rule 
1.16 and 1.15(b) require a lawyer not only to refund advance fees not earned but 
to do so in a timely manner. Many of the allegations against Sheridan came as a 
result of his failure to supervise an employee. Sheridan's primary faults were 
deemed to be neglect of clients, not following through with his responsibilities 
to his clients, mishandling his clients' money, not refunding unearned fees and 
not communicating with the Bar.
¶31 A three-year suspension was deemed appropriate in State ex rel. Okla. 
Bar Ass'n v. Stow, 1998 OK 
105, 975 P.2d 869, 
for conversion of client funds where the attorney used a client's funds for 
his own use and refused to account for or deliver funds of a client upon demand. 
Additionally, he did not respond to several requests for accounting made by the 
Bar; when he did respond, the accounts were unsatisfactory. In State ex rel. 
Okla. Bar Ass'n v. Reynolds, 2012 OK 95, 289 P.3d 1283, the attorney was 
suspended for two years and one day on five counts of neglect of cases, failing 
to keep clients informed of the status of their cases, collecting and retaining 
fees for which little or no services were provided and failure to respond to the 
grievances. At the time, Reynolds stood suspended for failure to complete the 
MCLE requirements. Reynolds admitted that she basically abandoned all of her 
pending cases in October 2010. She testified that she had problems with 
depression, but the trial panel found there were no mitigating factors 
presented.
¶32 In the present matter, the Respondent was admitted to the practice of law 
in Oklahoma on April 21, 2000, and has not been previously disciplined. At the 
hearing before the PRT, the Respondent for the first time offered in mitigation 
that he has suffered from bipolar disorder since 2002. He was treated through 
counseling and with medication from 2008 to 2009. The Respondent testified that 
the disorder did not render him incapable of practicing law, but only created 
difficulties in his law practice. The Respondent's counsel advised the trial 
panel that "Rule 10 is not an issue here whatsoever." Tr. 2-28-13 p. 492.[5] A disability 
does not immunize one from disciplinary measures and there must be shown a 
causal relationship between the condition and the professional misconduct. 
State ex rel. Okla. Bar Ass'n v. McCoy, 2010 OK 67, ¶25, 240 P.3d 675. The Respondent 
did not raise Rule 10 as a defense and we have not considered factors involved 
in a Rule 10 proceeding. State ex rel Okla. Bar Ass'n v. Young, 2007 OK 92, ¶39, 175 P.3d 371.
¶33 The Respondent does not express remorse for the difficulties he caused to 
his clients, nor does he admit he did anything wrong. He admitted he could have 
"handled things better," but he does not believe his conduct forms a basis for 
discipline. He denies any wrongdoing and denies he violated any of the rules of 
professional conduct or disciplinary proceedings. Even after being ordered by a 
court to refund $2,301.75 to the DeLeons, the Respondent still believes the 
entire fee was earned. We find the circumstances warrant the Respondent's 
suspension from the practice of law in Oklahoma for a period of two years. The 
Respondent actively avoided answering or establishing contact with his clients 
and he engaged in a pattern of behavior that was detrimental to them.
¶34 The Bar has filed an application to assess costs against the Respondent 
in the amount of $4,892.00, which includes $85.70 for lunch provided to the PRT. 
This Court does not find it appropriate to assess as costs the amount the 
members of the PRT spent on lunch during the three days of the hearing. State 
ex rel. Okla. Bar Ass'n v. Wilcox, 2014 OK 1, ¶ 57, ___ P.3d ___. 
The amount of $85.70 is deleted and the Respondent is ordered to pay costs 
of the proceeding in the amount of $4,806.30 within ninety (90) days of the date 
the opinion becomes final.

RESPONDENT SUSPENDED FOR TWO YEARS AND
ORDERED TO 
PAY COSTS.

¶35 COLBERT, C.J., REIF, V.C.J., KAUGER, WINCHESTER, EDMONDSON,
GURICH, 
JJ. - Concur
¶36 WATT, TAYLOR and COMBS, JJ., - Dissent

 
 
 
 TAYLOR, J., with whom WATT and COMBS, JJ., join, dissenting.
 " I would impose suspension for two years and one 
 day."

FOOTNOTES

[1] Rule 
1.1 provides that a lawyer shall provide competent representation to a client. 
Competent representation requires the legal knowledge, skill, thoroughness and 
preparation reasonably necessary for the representation; Rule 1.3 provides that 
a lawyer shall act with reasonable diligence and promptness in representing a 
client; Rule 1.4 provides that a lawyer shall keep a client reasonably informed 
about the status of a matter and promptly comply with reasonable requests for 
information, and that a lawyer shall explain a matter to the extent reasonably 
necessary to permit the client to make informed decisions regarding the 
representation; Rule 1.5 provides that a lawyer shall not make an agreement for, 
charge or collect an unreasonable fee or unreasonable amount for expenses; Rule 
1.15. Oklahoma Rules of Professional Conduct - Safekeeping Property
(a) A lawyer shall hold property of clients or third persons that is in a 
lawyer's possession in connection with a representation separate from the 
lawyers own property. Funds shall be kept in a separate account maintained in 
the state where the lawyer's office is situated or elsewhere with the written 
consent of the client or third person. Other property shall be identified as 
such and appropriately safeguarded. Complete records of such account funds and 
other property shall be kept by the lawyer and shall be preserved for a period 
of five years after termination of the representation.
(b) Upon receiving funds or other property in which a client or third person 
has an interest, a lawyer shall promptly notify the client or third person. 
Except as stated in this Rule or otherwise permitted by law or by agreement with 
the client, a lawyer shall promptly deliver to the client or third person any 
funds or other property that the client or third person is entitled to receive 
and, upon request by the client or third person, shall promptly render a full 
accounting regarding such property.
(c) When in the course of representation a lawyer is in possession of 
property in which both the lawyer and another person claim interests, the 
property shall be separate by the lawyer until there is an accounting and 
severance of their interests. If a dispute arises concerning their respective 
interests, the portion in dispute shall be kept separate by the lawyer until the 
dispute is resolved.
Rule 1.16(d) provides that upon termination of representation the lawyer 
shall take steps to protect a client's interests, such as giving reasonable 
notice to the client, surrendering papers and property to which the client is 
entitled and refunding any advance payment of fee or expenses that has not been 
earned or incurred; Rules 3.2 provides that a lawyer shall make reasonable 
efforts to expedite litigation consistent with the interests of the client. Rule 
8.1 concerns maintaining the integrity of the profession and provides that in a 
disciplinary matter, a lawyer should not knowingly fail to respond to a lawful 
demand for information from a disciplinary authority. Rule 8.4(d) provides that 
it is professional misconduct for a lawyer to engage in conduct that is 
prejudicial to the administration of justice.

[2] Rule 
1.3. Discipline for Act Contrary to Prescribed Standards of Conduct. 
The commission by any lawyer of any act contrary to prescribed standards of 
conduct, whether in the course of his professional capacity, or otherwise, which 
act would reasonably be found to bring discredit upon the legal profession, 
shall be grounds for disciplinary action, whether or not the act is a felony or 
misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a 
condition precedent to the imposition of discipline.
Rule 5.2 provides that the failure of a lawyer to answer within twenty (20) 
days after service of a grievance shall be grounds for discipline.

[3] The 
ethics opinion noted that fixed fees paid in advance are intended to cover a 
specified amount of work estimated by the attorney for a particular matter. 
Clients often prefer fees determined in advance to be a specified sum because it 
allows the client to know in advance just how much the total cost for legal 
services will be, permitting the client to budget based on a fixed sum rather 
than face potentially unlimited hourly fees that may exceed the client's ability 
to pay. The opinion notes that in some situations a flat fee may be determined 
based on an attorney's "towering reputation" for making a civil case vanish just 
by agreeing to the representation, or resolving a criminal matter with a few 
telephone calls. Having obtained the desired result, the attorney is 
entitled to keep the fee. Even if the result is not particularly successful, if 
the fee is reasonable, the terms have been adequately explained to the client in 
the fee contract and the services agreed upon have been performed, the 
lawyer ordinarily will not be required to refund any of the fee to the client 
(emphasis added).

[4] 
Disbarment was deemed the appropriate level of discipline for trust fund misuse 
in State ex rel. Okla. Bar Ass'n v. Young, 2007 OK 92, 175 P.3d 371. Young was 
charged in two counts of misconduct. Young used his trust account as an 
operating account and as a personal account and admitted misuse of his trust 
account and violation of the rules. He failed to competently represent and earn 
the fees charged and he failed to keep the client reasonably informed. He 
obtained permission from a medical center to endorse the settlement check on its 
behalf. He did not pay the medical center and did not return their calls. The 
check that he subsequently wrote from his trust account was returned for 
insufficient funds.

[5] Rule 
10, RGDP
10.2. Suspension. 
Whenever it has been determined that a lawyer is personally incapable of 
practicing law, his license to practice shall be suspended until reinstated by 
order of this Court.





 Citationizer© Summary of Documents Citing This Document
Cite
 Name
 Level
 None Found.
Citationizer: Table of Authority
Cite
 Name
 Level
 Oklahoma Supreme Court Cases Cite
Name
Level 1988 OK 65, 757 P.2d 825, State ex rel. Oklahoma Bar Ass'n v. Perkins
Cited 1992 OK 81, 833 P.2d 260, 63 OBJ 1714, State ex rel. Oklahoma Bar Ass'n v. Todd
Discussed 2002 OK 51, 51 P.3d 570, STATE EX. REL. OKLAHOMA BAR ASSOCIATION v. SCHRAEDER
Discussed 2003 OK 80, 84 P.3d 710, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. SHERIDAN
Discussed at Length 2007 OK 92, 175 P.3d 371, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. YOUNG
Discussed at Length 2008 OK 66, 195 P.3d 35, McQUEEN, RAINS & TRESCH, LLP v. CITGO PETROLEUM CORP.
Discussed 2008 OK 91, 202 P.3d 822, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. BERGER
Discussed 2010 OK 67, 240 P.3d 675, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. McCOY
Discussed 2012 OK 95, 289 P.3d 1283, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. REYNOLDS
Discussed 2014 OK 1, 318 P.3d 1114, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. WILCOX
Cited 1998 OK 28, 957 P.2d 114, 69 OBJ 1207, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. SPADAFORA
Discussed 1998 OK 105, 975 P.2d 869, 69 OBJ 3611, State ex. rel. Oklahoma Bar Association v. Stow
Discussed at Length 1999 OK 62, 990 P.2d 854, 70 OBJ 2093, State ex. rel. Oklahoma Bar Ass'n v. Stutsman
Discussed